THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. JACOB C. SILVERMAN, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. JAMES J. KLEINMAN, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. HENRY G. SINGER, Appellant.

Second Department, July 2, 1937.

*George Rosling*, for the appellant Silverman.

*David F. Price* [*Sol A. Klein* with him on the brief], for the appellant Kleinman.

*I. Gainsburg* [*Joseph P. Segal* and *Sol A. Klein* with him on the brief], for the appellant Singer.

*Hiram C. Todd* and *Franklin S. Pollak*, Special Assistant Attorneys-General [*Ira C. Werle* and *Egbert W. Doughty*, Special Assistant Attorneys-General, *Milton D. Lifset* and *John J. Geraghty*, with them on the brief], for the respondent in each action.

LAZANSKY, P. J.  Eight persons were indicted under one indictment.  Two of them did not appear; as to two, the jury disagreed; one, Carmine Anzalone, pleaded guilty; and the remaining three are now before this court.

On March 3, 1935, one Drukman was murdered in a garage on Moore and White streets, Brooklyn.  Immediately thereafter, Meyer and Harry Luckman and Fred J. Hull were seized by the police at the scene of the crime.  They were held to await the action of the grand jury.  The Drukman murder was submitted to a grand jury of the County Court in Kings county, for the April, 1935, term.  After final consideration thereof, on May 10, 1935, that grand jury failed to indict — fourteen members voting against, and seven for a true bill.  The Luckmans and Hull were thereupon

indicted in the County Court for murder in the first degree. That indictment was superseded by a similar one, found January 17, 1936, by a grand jury of an Extraordinary Special and Trial Term of the Supreme Court, appointed by the Governor to prosecute the murderers of Drukman and any persons who may have committed unlawful acts in legal proceedings arising out of the murder. The Luckmans and Hull were tried and on February 20, 1936, found guilty of murder in the second degree. The extraordinary grand jury indicted appellants, with five others, including said Anzalone, charging them with having conspired with ten others, not indicted, to obstruct justice in violation of section 580, subdivision 6, of the Penal Law, by impeding, obstructing and preventing the investigation of the Drukman murder and the indictment and conviction of the Luckmans and Hull. The specific objects of the conspiracy, as alleged in the indictment, were: (1) To procure police officers to neglect their official duties; (2) to procure said April, 1935, grand jurors to vote against an indictment; (3) to procure the district attorney and members of his staff to neglect their official duties; (4) to intimidate and conceal witnesses; (5) to induce witnesses to withhold information from and make untrue statements to the police and the district attorney and members of his staff.

Each of these appellants was charged with participation in the conspiracy with reference to matters separate and distinct from those with which the others were connected.

The trial lasted twenty-three days. The record is very long. In order to keep the opinion within reasonable length, there may be a survey and consideration of only the more essential items.

The accusation against defendant James J. Kleinman is that he sought improperly to influence the action of one Rieke, a member of the April, 1935, grand jury, with respect of finding an indictment or a dismissal of charges against the Luckmans and Hull by communicating with one Nagel, who communicated with one Elliott, who in turn communicated with said Rieke. There was proof that Nagel approached Elliott and that Elliott approached Rieke, but without the desired result.

The People's case to connect Kleinman depends almost entirely upon the testimony of Nagel. Kleinman, Nagel and Elliott were members of the March, 1935, grand jury in the County Court. That grand jury continued in session after the April, 1935, grand jury began its deliberations. Both grand juries convened in the same building.

Nagel, the People's witness, was unrestrained in reckless disregard of the truth, to the disadvantage of the People's case. That he perjured himself is admitted by both sides.

After an analysis of the false testimony of Nagel, its contradictions and inconsistencies, and disregarding subtle reasoning in connection therewith, and upon the rather violent assumption that under any circumstances he could tell the truth, it may be said that the sum and substance of his testimony is that some time in the latter part of March this defendant said to him that a case might come before the March grand jury; that the evidence might not warrant indictment; and he asked Nagel to help. Several statements involving this defendant, which, it seems, Nagel had made as a witness before the extraordinary grand jury, were at the trial asserted by Nagel to be untrue. These statements were with respect of the April, 1935, grand jury. The result was that the only real testimony of Nagel that came before the jury dealt with an attempt to corrupt a March, 1935, grand juror. The essence of the indictment is to corrupt Rieke, an April, 1935, grand juror. There is, therefore, no proof against this defendant within the purview of the indictment. If the proof concerning the April, 1935, grand juror had been developed, as was expected, then the testimony of what took place in March with reference to the jury for that month, if it were connected with the Drukman murder, may have been admissible. But in the state of the proof it became immaterial.

Nagel testified, as stated, that he had only the one talk in March with Kleinman. It was sought to refresh his recollection by reference to grand jury minutes, from which it appeared that this appellant had spoken to Nagel about the April, 1935, grand jury. Nagel was permitted to state he had so testified (a ruling which does not now require consideration), but that it was untrue; that the truth was that it was one Pearlstein who had thus spoken to him. Thus, there was no proof in the case that Kleinman had spoken to Nagel about the April, 1935, grand jury.

At recess, at the request of the prosecutor, Nagel was committed as a material witness, in a manner criticised by the defense. At the ensuing session his cross-examination was begun. For some reason, which remains unexplained, counsel for appellant asked Nagel if he told the truth when he testified at the previous session, and Nagel said he had not; that he had testified falsely. What he had testified falsely was not shown. It is inconceivable that appellant's counsel could have meant to adduce from Nagel that his testimony previously given that it was Pearlstein and not Kleinman who spoke to him about the April, 1935, grand jury, was false, and that the truth was that Kleinman had so spoken to him. But whatever counsel was seeking to prove by his questions, it is plainly shown by later testimony of Nagel that the latter did not mean to say it was Kleinman who spoke to him about the

April grand jury. Nagel, on further cross-examination, said that he intended to tell the truth at the previous session; that he had spoken to a member of the prosecutor's staff on the day of that session and told him that the man to whom he spoke was Pearlstein; that Kleinman spoke to him in March, and Pearlstein asked him to see Elliott; that he told this staff member that what he told him was the truth. He also testified that there was not anything in his entire testimony of the previous session that he wished to change; that he spoke to Kleinman only once about the case. He admitted on his redirect examination that he had not told the People's representative that Pearlstein had the conversation about the Drukman murder case before the previous Saturday's session. Before that he had told him that Kleinman had the conversation. He changed his story because he wanted to tell the truth. He had not done it before because he was afraid. He stated to the court that he did not know why he had said it was Kleinman. It is clear, therefore, that the witness meant to stand by his testimony earlier given, that it was Pearlstein, and not Kleinman, who spoke to him about the April, 1935, grand jury.

Pearlstein was called as a witness and testified he had not spoken to Nagel on the subject. That testimony was not proof of a material fact. That Pearlstein had not spoken to Nagel about the April, 1935, grand jury was not proof that Kleinman had so spoken. The testimony was improperly received.

It is claimed that appellant's counsel in his summation admitted the Nagel story about Pearlstein was untrue. Undoubtedly, what he really meant was that Nagel could not be believed under any circumstances. Even if the former were so, it does not change the state of the record, i. e., that there is no proof that Kleinman spoke to Nagel about the April, 1935, grand jury. It may be that the People have been betrayed by Nagel, but a case was not developed out of his testimony.

Assuming, however, that there had been proof, through Nagel's testimony, that appellant sought improperly to influence the April 1935, grand jury, it is urged that there was a lack of the required corroboration of an accomplice.

The People attempted to establish corroboration through Weiss and Cohn, April, 1935, grand jurors, the latter having been a participant in the Singer case. Weiss testified that the March, 1935, grand jury continued its sessions while the April, 1935, grand jury was deliberating. Both used the same room, the April grand jury in the morning, and the March grand jury in the afternoon, when the former was not using the room. On occasions as he was leaving the court room he met members of the March,

1935, grand jury coming in. About the end of April or early in May, he and Cohn had returned from luncheon and were standing in front of the court house just before the time to return to the jury room. Appellant, the father of William W. Kleinman, one of the defendants as to whom the jury disagreed, greeted him and said: " I understand you fellows are having a hell of a time with the Luckman case." Weiss said: " Well, that is a kind of a funny remark to make. How would you know that we are having a hell of a time with the Drukman case or the Luckman case? " Kleinman said: " I did not mean any harm. I just heard that." Weiss said: " Well, it is kind of a funny remark for you to make, especially you are the father of an assistant district attorney and ought to know better than that." Kleinman apologized and they went about their business. Cohn's testimony was not quite so comprehensive. He testified that Kleinman said: " You fellows are having a hell of a time in there, ain't you? " Weiss said: " What the hell do you know about it? " Cohn said nothing, and Kleinman walked away. It will be noted that Cohn himself said nothing about the Drukman or the Luckman case.

These words of Kleinman were nothing more than the expression of a casual interest by one grand juror in the labors of another grand juror serving at the same time, the members of which grand juries undoubtedly were greeting one another as they met outside of the jury room. The remark contained no sinister suggestion. The meeting was accidental, and not by appointment. The Drukman case was a matter of public notoriety. Gossip around a court house is not unusual. Some newspapers may publish conjectures of what is going on before a grand jury, based upon observation of the witnesses who enter the grand jury room. The remark was merely a greeting, no more suggestive of wrong than an ordinary greeting between a member of one body and that of another engaged in like service. As stated by JENKS, J., in *Werner* v. *Interurban Street R. Co.* (99 App. Div. 592): " All persons familiar with the doings of our courts know that attorneys, counsel, jurors and witnesses who are strangers but for the contact in a trial, are accustomed to greet one another and exchange commonplaces, or, as the vernacular has it, ' pass the time of day.' Such conduct is ascribed to common courtesy, not to conspiracy. It is rarely made the subject even of comment." There is no proof that this appellant joined with any other person in any other activity or in any other manner whatsoever in connection with the Drukman murder. Therefore, even upon the assumption indicated, the crime charged was not proved, because there was no testimony that tended to connect the defendant with the commission of the crime, a subject to be considered more fully in the Singer appeal.

It may be possible that on a retrial Nagel would retract his testimony, given on this trial, that it was Pearlstein who spoke to him about the April, 1935, grand jury, and not Kleinman, and testify that it was Kleinman. However, in such case his testimony would be so completely incredible that it would be difficult, if not impossible, to sustain a verdict of guilt on any such testimony. Under the circumstances, and in view of the want of corroboration, to order a new trial would be futile.

Therefore, as to this appellant, the judgment of conviction should be reversed and the indictment dismissed.

Against defendant Singer it is charged that on or about April 29, 1935, he *conferred* with defendant Anzalone at 215 Montague street, in the county of Kings, with reference to communicating with one Cohn, an April, 1935, grand juror, for the purpose of offering a bribe to Cohn to influence his action as a member of that grand jury in connection with charges pending before it against the Luckmans and Hull. The indictment charges Anzalone with having offered to bribe Cohn for the purpose stated.

The actors in Singer's case were as follows:

Defendant Singer, thirty-seven years of age, was born in Brooklyn and is a graduate of a Brooklyn high school. He attended college until November, 1917, when he enlisted in the United States army and then saw active service in France, receiving an honorable discharge in June, 1918. After his discharge he studied law in France, and upon a return to this country, after a short attendance at a local college, he entered law school and was admitted to the bar in January, 1924. He was engaged as a clerk in the office of Joseph A. Solovei, named as a co-conspirator but not indicted, for about three years. In 1929 he was appointed an Assistant United States Attorney for the Eastern District of New York and in January, 1933, he became chief assistant. Resigning from that office on July 24, 1934, he resumed the practice of law in association — not partnership — with Mr. Solovei. While assistant prosecutor, he conducted a trial in which one Nittoly, a witness in this case, was convicted of forgery and perjury, growing out of a bail bond business conducted by him. At the same time, two brothers of Nittoly, and three others, were likewise convicted. They were all sent to prison and the bail bond business destroyed. He also prosecuted one Vigoretto, a friend of Anzalone, who will be referred to later. While this defendant was acting as an Assistant United States Attorney he was rebuked and criticised by the United States Supreme Court in one case, and by the United States Circuit Court of Appeals in another, for improper conduct.

Ann Singerman was secretary and stenographer in the employ of Solovei for about eleven or twelve years. In the office, in addition to defendant Singer, were two other lawyers. Miss Singerman did all the stenographic work and took care of the telephone service, except when she was relieved by an attorney who was also a clerk.

Carmine Anzalone at the time of the trial was unemployed. He had been an active member of a local political club for about sixteen years. From 1923 until 1934 he was a Deputy United States Marshal. While serving as such he became acquainted with defendant Singer and knew him for about six years. After he quit the office of Deputy United States Marshal, he became associated with Nittoly and one Sicilia in a private detective agency in Brooklyn, procuring evidence in matrimonial cases.

Charles Nittoly, upon whose testimony the People mainly relied for corroboration of Anzalone, an accomplice, was at the time of the trial an investigator for the mayor's committee on city planning. He had known Anzalone for about twenty years, and at one time was a Deputy United States Marshal, and worked with Anzalone for four years. Later he became engaged in the bail bond business, and, because of crimes in connection therewith, was indicted and convicted of perjury and forgery and sent to prison, as already stated.

Frank Sicilia, at the time of the trial, was employed in the department of public welfare. He had been a partner with Anzalone and Nittoly in the detective business. He had been a second lieutenant in the United States army and connected with the National Guard. He had known Anzalone for about ten years.

Stated in general terms, the case of the People was that Singer communicated with Anzalone and arranged for a meeting at the former's office; that they met; that Singer requested Anzalone to bribe one Cohn, a member of the April, 1935, grand jury, not to indict the Luckmans and Hull; and that Anzalone tried to bribe Cohn, but failed.

Singer denied that he had any dealings whatsoever with Anzalone. Corroboration of Anzalone's story of his relations with Singer was an essential factor. Without it, there really would be no case for the People. It was sought to supply it principally by testimony of Nittoly that he received telephone messages from Singer for Anzalone at the time Anzalone says he was dealing with Singer. Defendant claims this story is a pure fabrication, clearly indicated by the perjury of Anzalone, his eagerness to avoid imprisonment, and his otherwise demonstrated very low moral standard, Nittoly's criminal record, and the opportunity and desire of both to avenge the imprisonment of Nittoly, his brothers and friends, and to

square accounts with defendant for refusing to intercede in behalf of another criminal, a friend of Anzalone.

In considering Anzalone's testimony it will be well to bear in mind certain facts with reference to his position before the court. He was indicted on March thirteenth and held in $15,000 bail, which was not furnished. On March sixteenth, after waiving immunity, he testified before the extraordinary grand jury. That same day his bail was reduced to $2,500, which was given, and he was released from jail. Before indictment he was promised immunity by the Special Assistant Attorney-General, but after indictment he was told that he could not expect immunity, but that there would be an application to the court for consideration. At the opening of this trial he pleaded guilty, but was not arraigned for sentence until after the trial, when sentence was suspended.

It is very important, in weighing his testimony, to note carefully that just before he appeared before the extraordinary grand jury he had made an affidavit in which it is set forth that Singer called him on the telephone in the latter part of April, 1935; that he then went to Singer's office, where the bribe deal was arranged; that he tried and failed to bribe Cohn; that a few days later Singer again called him at his office in connection with the matter; and that after the April grand jury failed to indict (May 10, 1935), Singer again telephoned him and asked him to come to his office, where the vote of the grand jury was mentioned, as was the fact that Cohn did not vote to dismiss. This affidavit was written in the presence of and delivered to one of the prosecutor's staff outside the grand jury room, where Anzalone was brought from jail at his own request. It does not contain a word, directly or indirectly, about Nittoly or any other person as a medium of messages between Anzalone and Singer. In his testimony before the extraordinary grand jury, Anzalone, in substance, repeated the contents of the affidavit, and there again there was not a word mentioned about Nittoly.

In view of this affidavit and the grand jury testimony, it might be expected that this witness for the People would be interrogated in accordance with the substance thereof. But the first question — a leading one — in this connection was: " Do you recall that during the latter part of April, 1935, you came to your office one day and found a message on your desk? " The answer was " I do." Over objection and exception he was permitted to say that he found a message on his desk for him to get in touch with Henry Singer. He then telephoned Singer, who told him that he wanted to see him. The story about a message on his desk — as to which his testimony before the grand jury and the contents of his affidavit

were impressively silent — paved the way for the testimony of Nittoly, without which, assuming it to be corroboration, there would not be any real corroboration of Anzalone who, concededly, was an accomplice. However, even then, Nittoly was not mentioned. His direct examination continues. He said there were three or four other telephonic communications with Singer, but he was not asked and did not testify that any word was received by him from Nittoly that Singer had telephoned. In fact, there is no suggestion in his entire direct testimony that a third person was the carrier of a message from Singer, except as indicated in the leading question already mentioned.

From the approach made by counsel for Singer on cross-examination, it seems very likely that nothing was known by him of the affidavit and testimony before the grand jury.

Despite the fact that the paper dated March 16, 1936, signed by him, the existence of which was not disclosed, was shown to Anzalone, and although on direct-examination Nittoly was not named, he stated that Nittoly received the first message from Singer and that he then went to see Singer the same day. He even repeated, on further cross-examination, that it was Nittoly who received the first message. Finally, when his attention was specifically directed to the March sixteenth affidavit, he said his statement in court that Nittoly gave him the message was not true. On further cross-examination, he testified as to a *second* communication with Singer; and when asked if it came personally or through Nittoly, he said he did not know, and then, directly thereafter, said that a message was left for him by Nittoly, who laid a note on the desk. He said it was not until after he had testified before the grand jury, but before he had pleaded guilty, that he told the prosecutor that Nittoly gave him the message. On redirect examination, he said there were several telephone conversations with Singer, as to some of which he connected directly with Singer, and that others were had after a note left by Nittoly. No notes were produced; they had been destroyed. When Anzalone called at Singer's office the first time, which, it is now conceded, was April 29, 1935, and had his first meeting, he says that Miss Singerman was there.

Nittoly testified he knew Miss Singerman, and in the latter part of April and May, the dates he did not know, Miss Singerman rang up the office and he answered the telephone. She told him to have Anzalone get in touch with Singer. Each time he made a note of the message and put it on Anzalone's desk. None of these messages was from Singer directly. Sicilia testified that he saw Nittoly write a message. He saw the message, and it stated: " Anzalone, call Mr. Singer." Cohn testified that Anzalone had

attempted to bribe him at his home by offering him $100. Singer was not mentioned. This was the amount which Anzalone says Singer authorized him to offer. Anzalone was to receive $50. Mrs. Cohn testified to a visit to her husband by Anzalone and to part of their conversation, and to Anzalone's later efforts to reach her husband by telephone. Miss Singerman denied any communication with Nittoly, and denied that Anzalone had ever called at the office.

Defendant argues that Nittoly's testimony is not admissible because there is no proof that Miss Singerman was authorized to speak to either Anzalone or Nittoly. It is pointed out that authority of an agent to commit a criminal act will not be inferred. But Miss Singerman's acts were not criminal. The real question is: May it be inferred from the circumstances that Miss Singerman was requested by Singer to communicate with Anzalone, assuming the witnesses for the People are believed. In our opinion, in view of the relationship between Miss Singerman and the defendant, considering the nature of her services, it may be inferred that she was requested by defendant to telephone to Anzalone to make an appointment. It was something that she would do in the regular course of her work, assuming she did telephone.

A more important claim by this defendant is that Anzalone's testimony was not corroborated, as required by section 399 of the Code of Criminal Procedure, which prevents a conviction upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime.

If it be possible to believe any part of Anzalone's testimony, it must be assumed he meant finally to say that his first word with Singer was by direct communication with him. Of course, Nittoly had no way of knowing which communication was the first. Therefore, if there were nothing further, there would be no corroboration. But Anzalone testified that he had subsequent telephone conversations with Singer concerning the proposal to bribe Cohn. These, he says, were brought about through Nittoly, who testified that he received telephone messages from Miss Singerman that Singer wished to speak with him. It is claimed that this is the essential corroboration.

It will be unnecessary to discuss the various authorities referred to in appellant's brief when dealing with the import of this section, in view of the rule in *People* v. *Dixon* (231 N. Y. 111), confirmed in *People* v. *Crum* (272 id. 348). These cases seem to lessen radically the scope of requirement for corroboration from that indicated in earlier cases. It is stated in the *Dixon* case: " The

' other evidence ' must be such ' as tends to connect defendant with the commission of the crime.' The corroborative evidence need not show the commission of the crime; it need not show that defendant was connected with the commission of the crime. (*People* v. *Mayhew*, 150 N. Y. 346, 353; *People* v. *Cohen*, 223 N. Y. 406, 426.) It is enough if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth. The corroboration is not restricted to any particular point. Its connection with defendant's own statements and denials should be considered. (*People* v. *Becker*, 215 N. Y. 126, 140.) It may vary in its nature according to the circumstances of the particular case. Matters in themselves of seeming indifference or light trifles of the time and place of persons meeting may so harmonize with the accomplice's narrative as to have a tendency to furnish the necessary connection between defendant and the crime."

Between Singer and Anzalone there had been no relationship of any kind which called for telephonic communication one with the other. The telephone talks, the first they ever had, were as unusual as unexpected. Prior to that time the April, 1935, grand jury was in session Singer had had some interest in the Drukman matter. Under all these circumstances, information from an independent source, if believed, that Singer sought to contact Anzalone, tends to some extent to carry credence to the accomplice's story that they met. Of itself but a " trifle," yet, combined with Singer's denial that he requested Miss Singerman to telephone to Anzalone for him, it tends to corroborate Anzalone that Singer made the corrupt proposal. Other than the testimony of Nittoly, and that of Sicilia, who said he saw one of the notes from Nittoly to Anzalone, there is no real corroboration. Singer's relationship with Solovei is not corroboration; nor are Singer's activities in the Drukman murder case. The failure of defendant to call Solovei as a witness is not corroboration, because it is not proof of a fact.

However, it is our opinion that the verdict of the jury was against the weight of the evidence. In order to sustain this verdict it is necessary to " find that the evidence is of such weight and credibility as to convince us that the jury was justified in finding the defendant guilty beyond a reasonable doubt," and to have in mind, at the same time, " to be chary of an accomplice's testimony as there are so many reasons which may lead one to shift to, or share the crime with another." (*People* v. *Crum, supra*.)

An accomplice, whose testimony of course is essential, is generally one who is lacking in a sense of honor and in moral scruple. How-

ever, in such a case, it is frequently the only direct testimony which is available. It must be weighed by a jury with the corroboration and in the light of all the surrounding circumstances. Although it may be difficult to believe the testimony of an accomplice, if it appear that there is nothing in the case which has deprived the jury of a fair opportunity calmly and deliberately to consider the proof and there are no errors of law, the verdict should not be disturbed.

But here there is something more than the usual betrayal of his associate by an accomplice. There is deliberate perjury by Anzalone as to the means of communication with Singer before their first meeting, and, in view of the affidavit and testimony before the grand jury, perjury as to subsequent communications. Anzalone not only committed perjury in testifying on the trial differently than he swore in his affidavit and before the grand jury, but on the trial he also swore first one way and then the opposite. It is plainly indicated that the purpose of Anzalone's testifying that he received a message or messages from Singer, not directly from the latter, but through another person, was to furnish the basis of what might be considered to be corroboration of his own story. There was a strong motive for doing this. He not only expected immunity from punishment which was at one time promised to him, and he was not disappointed in his expectation but there was a vengeance to be satisfied, in which his partner, Nittoly, also a perjurer, joined him, against defendant, who was the prosecutor and thus one of the causes of the confinement in prison of Nittoly, his brothers and friends, and the destruction of Nittoly's corrupt business. In addition to this, it appears from Singer's testimony, not controverted, that Anzalone was a friend of one Vigoretto, who had been involved in the automobile theft " racket " and sentenced to ten years in the Federal penitentiary, after prosecution by Singer, who, upon refusing to comply with Anzalone's request to assist in procuring a light sentence for Vigoretto, was warned by Anzalone that he was playing with fire and dealing with dangerous men. It also appears that Vigoretto made an application in the Federal court to have his judgment of conviction set aside, and therein made an attack on the integrity of Singer. The motion was withdrawn, but while it was pending, according to Singer, Nittoly telephoned him and threatened him with further trouble, and told him he had not heard the end of the thing. To cap the climax of Anzalone's demonstration of his want of moral sense, he testified that he did not know that it was wrong to bribe a juror, although he had been a Deputy United States Marshal for twelve years, during which he had charge of juries, grand and petit. With such a powerful motive and lack of understanding

between right and wrong it is easy enough to understand how Anzalone would be willing to involve Singer, and also to procure another with a criminal record as a perjurer to testify to telephone messages, and still another to testify that he saw one of the notes allegedly written by Nittoly. The testimony of these men and its development upon the trial, and their previous histories, leave a very strong impression that Anzalone was induced to change the testimony given by him before the grand jury and his statements in his affidavit in order to involve Singer, to procure for himself merciful consideration at the hands of the court, and to avenge the wrong he felt was done to his friends by Singer, and that for these reasons he was able to procure the co-operation of his friends. It is argued by the prosecution that the idea that Anzalone would testify that he had dealt with Singer, when as a matter of fact he had not, is fanciful. That men do such things is excellently illustrated in this very case. It will be remembered that Nagel in one place testified it was Kleinman who sought to have an April grand juror approached, and then at another time testified it was Pearlstein.

Despite the low standards of morality of these men on the one hand and the alibi of Singer on the other, the jury favored the former. The jury must have estimated the value of the testimony of these witnesses above its true worth, induced in large part by the following: (1) Failure of the court specifically to instruct the jury how to evaluate the testimony of such men; (2) omission of the court to advise the jury of the real issue between the People and Singer; (3) erroneous charge as to Singer's alibi defense; (4) admission in evidence of the bloody details of the Drukman murder; (5) admission in evidence of the alleged suicide of Detective Hemendinger.

These first three items will now be considered. The last two are also involved in the Silverman case and will be left for later consideration.

(1) In its charge the court made a general reference to the value to be given to the testimony of a perjurer, and referred particularly to Nagel in the James J. Kleinman case, but omitted to make any reference whatsoever in the Singer case to the fact that Anzalone had perjured himself on the trial and that Nittoly was a perjurer and a forger. To refer to Nagel and omit reference to Anzalone and Nittoly may have carried a false message to the jury. The court should have made specific reference to Anzalone and Nittoly, for upon them the People's case against defendant Singer entirely rested. Of course the reference to Anzalone as an accomplice is an entirely different matter.

(2) The only reference of consequence to Singer's case in the charge was to the testimony of Anzalone and his associates as to the telephone messages and to Anzalone as an accomplice. The court stated that Miss Singerman called up the detective agency and asked for Anzalone, and that notes were left notifying the latter that messages had come from Singer's office. Nothing was said about the important April twenty-ninth session. There was silence as to Singer's claim that he was not in his office on April twenty-ninth, nor was there any reference to the alibi testimony in behalf of Singer. This was a matter of grave import, because, if the jury found that the case in support of Singer's alibi was true, which meant that Singer was not in his office on April twenty-ninth, then in all likelihood the People's case would fall, as hereinafter indicated.

(3) Although some of the witnesses for the People were unable to give any exact dates in April and May, 1935, with reference to the telephone messages, there is proof in the case, and it is conceded by the prosecution, that it was on April twenty-ninth that Singer spoke to Anzalone for the first time over the telephone, and that in the afternoon of that day the latter called at Singer's office and proposed that juror Cohn should be bribed, assuming he 'phoned and spoke at all. Singer testified he was not in his office on April twenty-ninth. In this he was supported by Miss Singerman. Anzalone's visit was in the afternoon. Singer, his wife and friends, testified that he was at home, ill in bed, on the afternoon of April twenty-ninth, after having attended some court appointments in the morning. He was also ill and in bed between May fourth and May eighth, as to which doctors and others testified. There was practically no cross-examination of the witnesses who testified in connection with Singer's alibi, except Miss Singerman. In the noticeable absence of anything in the main charge with reference to the alibi, defendant's counsel asked the court to charge that if the jury believed the testimony of the witnesses who testified concerning Singer's absence from his office on April twenty-ninth, and his illnesses thereafter, the defendant should be acquitted. The court made the following statement: " You did not ask me to charge on alibi. You asked me to charge if the jury believed certain witnesses. I will say that an alibi is a good defense, a splendid and perfect defense if it is satisfactorily proved. But an alibi with a hole in it is not as good and therefore it is for you to say whether this alibi that Singer has given evidence concerning has any opening in it so that there was an opportunity upon Singer's part to have communication with Anzalone which Anzalone claims that he did have." To this an exception was

taken. By this language the court clearly instructed the jury that it was for Singer to prove his alibi. This, of course, was "capital" error. The burden rested upon the People to prove the guilt of the defendant, and this included proof that the defense was not one supported by the facts.

The defendant does not carry the burden of proving an alibi defense. (*People* v. *Russell*, 266 N. Y. 147, where it is said: "Evidence by a defendant that at the time when it is charged that a crime was committed he was at some other place does not constitute an exculpatory defense upon which the defendant has the burden of proof. Rather, it is evidence which if believed shows that the defendant could not have participated in the crime as claimed by the People.")

The question of Singer's presence in his office on April 29, 1935, was of transcendent importance. If the jury found that Singer was not at his office on April twenty-ninth, the all-eventful day in the case, then, of course, Anzalone could not have met him and the corrupt proposal could not have been made. Were such the finding, the People's case would undoubtedly collapse, for if this outstanding feature, *i. e.*, the conference, did not take place, then it would be nigh impossible for any one to believe the rest of the story about telephone messages and the meeting after May 10, 1935, when the April grand jury voted against finding a true bill. So it must be readily understood how vitally essential it was that, in respect of this alibi, the law should be accurately expounded. The court cast upon defendant a burden contrary to well-established law. It is likely that this error had a serious effect upon the result, and it may not be overlooked. It came after the main charge and cannot be held to be offset by the statement in the general charge that the burden of proof rested upon the People to prove guilt beyond a reasonable doubt.

As to defendant Jacob C. Silverman, also called "Jack," there is a general accusation in the indictment that he participated in the conspiracy to obstruct justice by influencing an April, 1935, grand juror, and the overt act charged against him in the indictment is that, to effect the objects of the conspiracy, he and Leo P. Byk, on March 28 and 29, 1935, communicated with one another.

The testimony shows that before the indictment of the Luckmans, Silverman said to one Siegel that he was sorry for the Luckmans and expressed the wish that he could help them. He thus expressed interest in the case. The proof also showed that Silverman and Byk were intimates, and that on April 10, 1935, Byk had offered a bribe to Police Officer Corbett in connection with the Drukman murder. In December, 1934, appellant was adjudicated a volun-

tary bankrupt, and the following month he filed a schedule showing he had assets of $250, following which there were financial transactions of this defendant which seem to have no serious connection with the situation. There is also proof that this defendant was in telephonic communication from a distant point with Byk, one of the alleged conspirators, but the subject was not indicated. This was some time late in March, 1935. It is suggested it brought him home as the April grand jury began to function.

The important testimony involving this defendant comes from the tapping of his telephone wires. The testimony of police officers was as follows: At three-seventeen P. M. on May 10, 1935, after the grand jury had voted against indicting the Luckmans and Hull, defendant telephoned Byk and asked him if he had heard the news. Byk replied he had and would see the defendant later. At three-thirty P. M. defendant telephoned Abraham Kesselman, a Brooklyn attorney who had represented Morris Luckman when the November grand jury indicted him. He asked Kesselman whether he had heard the good news. At three-forty-five P. M. he called a man named Schamberg and asked him if he had heard the good news, and that the two fellows were out on the street, free. A part of the conversation was conducted in Yiddish, and the name " Meyer " was mentioned. At three-fifty-three P. M. he spoke to David P. Siegel, who had acted as his lawyer and was a friend of Meyer Luckman. He told Siegel that he had some good news, " Those two fellows will be out in fifteen minutes," and when Siegel asked " Who do you mean, M. L.? " Silverman answered, " Yes." Siegel asked if Silverman had called " that fellow to tell him about it," and Silverman said, " Nix, nix." Siegel said: " I would like to get some good news about Brooklyn," and Silverman said: " Listen, those fellows won't believe what I can do so I had Frank Costello's brother Eddie with me and I told him to sit there and listen so that he would know that I took care of it." Siegel said: " That is o. k. but we have to be careful. We don't want McQuillan and his intelligence unit walking in on anybody." McQuillan was an internal revenue agent. At four P. M. he called one Rubinstein. Rubinstein said: " It was good news about those two fellows," and Silverman answered " Yes," and he would try to do as good for him. Rubinstein was at that time out on bail on a criminal charge on which he was tried one month later. At this same time defendant asked Rubinstein where M. S. was, and Rubinstein said he was waiting to hear from him. M. S. is probably Max Silverman, one of the defendants herein who has left the jurisdiction. There was another telephone message at four-fourteen P. M. Max Silverman called the defendant. The

conversation was in Yiddish, but defendant in one instance said: " Those two fellows are out on the street."

The testimony of the one police officer as to Silverman's telephone conversations was not too impressive. He said that he learned Silverman's voice from these telephone conversations and the utterance of Silverman of some eighteen words while he was standing before an automobile on the street in front of his place of business. The other officer testified that the telephone conversation took place at a time when the witness Siegel admitted he had a conversation over the telephone with Silverman. There is, however, a difference in the subject of the conversation.

From defendant's relationship to the parties, and the language used by him in these telephone conversations, it is sought to infer that he had done something in an endeavor to prevent the indictment and conviction of the Luckmans. Silverman surely showed an interest in the Luckmans and a desire to help them. About the time that the grand jury failed to indict, he communicated with a number of people asking them if they had heard the good news. In the course of the conversation with one of them, the name of " Meyer " (the given name of one of the Luckmans is Meyer) was mentioned; in another " M. L." was mentioned, and in a third, to one who was awaiting trial on a criminal charge, he said he " would do as good for him." The reference in the talk with Siegel to something that Silverman had taken care of may have been connected with some internal revenue matter and not with the Drukman case.

It is argued that the defendant had committed no overt act, and that all the items of activities stated against him are only susceptible of an innocent construction; that defendant had a right to be interested in the Drukman case, and had the right to rejoice when the grand jury failed to indict; and that this is the sum and substance of everything that is said against him. Of course, it is not necessary to prove that each member of a conspiracy has committed an overt act. It is necessary only to prove that men have united in the pursuit of an illegal objective and that in the course thereof one of them has committed an overt act for the purpose of reaching the objective. There is no overt act charged against this defendant. There is testimony that there was a telephonic connection between this defendant, who was in Hot Springs, Ark., and Byk sometime in March. But this, of itself, seems to be of no consequence, as it was not shown what the subject-matter of the conversation was. However, the interest that this defendant indicated in the Luckmans after they were apprehended, and his desire to help them; his association and intimacy with

Byk, a conspirator, but not indicted, who attempted to bribe Police Officer Corbett; his communications with his friends and friends of the Luckmans of the news of the failure of the grand jury to indict, in one instance stating that the Luckmans would be freed in fifteen minutes, and in another instance stating to one of his friends, who was awaiting trial on a criminal charge, after having mentioned the fact that the Luckmans were free, *that he would try to do the same for him*, would justify a jury in finding that he had joined with others in endeavoring in some way to prevent the Luckmans from being indicted.

He proposed to do something for the indicted man, as he had for the Luckmans. The Luckmans had not been indicted. It may be inferred from his statement that he had done something to bring about that result. The grand jury is an *ex parte* acting body. Its deliberations are secretly conducted. Persons charged with crime and witnesses do not appear by attorney. For an outsider to have done something to procure a grand jury not to indict, he must have tampered with a witness or improperly influenced a public official or a grand juror. Therefore, in view of this defendant's associations, especially with Byk, as to whom there was testimony of an attempt to bribe a police officer in connection with the Drukman murder, there was warrant for finding that this defendant was connected with an effort to hinder the proper administration of justice in connection with that event.

This defendant did not take the stand. One Siegel was called as a witness for the People. He had been defendant's attorney. The prosecuting attorney asked him if while he was an Assistant United States Attorney Silverman was a defendant in a transaction. The intimation was that Silverman was a defendant in a criminal prosecution. The court instructed the jury to disregard it and any implication that might flow from it. Directly thereafter, the prosecuting officer asked the witness if at another time he represented defendant in a case in the Magistrate's Court. The intimation, of course, was that this defendant was a defendant in that court. The prosecuting officer stated that his only object was to show the acquaintance with the witness, although it had already been demonstrated that they knew one another. The court ruled that the question was improper and declined to grant a mistrial. When Police Officer Cashman was on the stand, testifying with reference to the telephone messages the prosecuting officer it is claimed, permitted Cashman to mention that the defendant was associating with a notorious character called Charlie Lucky. On the cross-examination of William W. Kleinman, one of the defendants, and as to whom the jury did not agree, the

prosecuting attorney asked him if he knew anything about this defendant's criminal record. A motion was immediately made for a mistrial. The court denied the motion upon the theory, it seems, that upon the examination of talesmen defendant's counsel asked the jurors concerning the criminal record of the defendant. Surely that would not justify this interrogation in an attack upon the character of defendant who did not take the stand and offered no character evidence. The court denied the motion for a mistrial. He told the jury to disregard the whole thing. These interrogations on the part of the prosecuting attorney were improper and should not have been propounded, since the character of the defendant was not in issue. The court directed the jury to disregard the implications of these questions, and, in the case of the " Lucky " testimony, struck it from the record.

While it is conceded that these questions should not have been asked, especially the one propounded to Kleinman as to the criminal record of defendant, it is urged that defendant has nothing to complain of because upon the examination for the qualification of jurors the counsel for defendant referred to some trouble defendant had had fifteen years before in the Bankruptcy Court. This surely is no justification for attacking defendant's character, when it is not in issue. It is also claimed that the same reference was made during the summation of defendant's counsel. This merely had reference to one incident, and not to a " criminal record." In a case such as this, where the atmosphere was full of charges made against many individuals, who were called conspirators, and each of the defendants had to bear the burden of the wrongs of his alleged co-conspirators, it was the duty of the prosecuting officer to avoid transgressing well established rules. It is doubtful that, in a case such as this, the effect of this impropriety was eradicated by the judge's direction that the jury disregard these matters, even though no attention was paid to this defendant in the charge; the People's claim was not stated and defendant's name not even mentioned. However, for reasons which apply as well to the Singer case as to this, the determination herein is reached on other grounds presently to be considered.

The foregoing statement of facts with reference to these three defendants indicates that it could not have been a very easy task for the jury to come to a finding of guilt.

The case against James J. Kleinman was built almost entirely around the testimony of a rank perjurer. In Singer's case the principal testimony came from the lips of a man who perjured himself upon the trial, and from another who was a forger and a perjurer. The Silverman case is made up of inferences from his

associations and from telephone calls, the testimony concerning which is far from being strong. Under such circumstances, in order that defendants might have a fair trial, it was the duty of the court to keep from the jury any subject matter which would tend to lead its members from the path of calm and deliberate reason into the toils of prejudice and passion. It was also of vital importance that there should be no act on the part of the trial court or the prosecutor that would convey to the jury any idea that the court believed the defendants were guilty.

It will be remembered the Drukman murder was being considered by the April, 1935, grand jury. The Luckmans and Hull were involved. The indicted defendants were charged, with others, with having formed a conspiracy to enable the Luckmans and Hull to evade an indictment at the hands of that grand jury.

At the opening of the case the prosecution started to relate the details of the Drukman murder, beginning with the alarm received by a police radio car. This was objected to by the defendants. The court declined to make a ruling at that time. Counsel representing defendant Singer was willing that it be stated to the jury that the act was done as recited in the indictment in the case at bar. The court ruled that the People had a right to prove the facts. To this an exception was taken. To the jury was then related every tragic and dramatic incident of this brutal murder; how the detectives broke into the garage and found the Luckmans and Hull, and the effort of Hull to escape; their hands were covered with blood; their clothes drenched with blood; the finding of some of Drukman's clothes in a Nash car; the finding of a body in the rear compartment of the Ford auto in a large canvas bag, under which there was oilcloth placed carefully on the bottom of the compartment, indicating the body was to be removed; the ripping open of the canvas bag by the police and the finding of the still warm body of a dead man, with ropes tied around the arms and around the wrists, the wrists being tied behind his body and the rope leading around his neck; a rope tied around his ankles so that they were doubled up back of him, and done in such a way that every attempt of the man, when alive, to free himself would strangle him to death; in the Ford car there was also a sawed-off end of a pool cue weighted with lead pellets at one end, with blood marks on the butt end. After this outline in detail of that harrowing and distressing scene, the People presented Detective McAuliffe, who proceeded to give in the minutest detail an account of the capture of the Luckmans and Hull, the discovery of the crime, and the attending gruesome conditions, despite insistence on the part of the defendants that the details of the murder should not be

recounted. The detective was even permitted to describe the wounds on the body. The canvas bag in which the body was found and the oilcloth which was found on the floor of the car were offered and received in evidence, and, at the court's direction, were placed upon the table before the jury, with the statement that if any of the jurors wanted to handle it they could although the court did not think it was necessary. When counsel for defendant asked that the record show that both of these exhibits were placed on a table alongside of the jury box, it was directed that they be put over in the corner. A number of photographs were admitted in evidence over objection and exception. There was a photograph of one of the Luckmans and the witness McAuliffe as they were leaving the garage, a photograph of Harry Luckman, of Police Captain Carey and Detective McAuliffe, and also a photograph of the body as it lay in the Ford car.

The description of this horrible affair must have aroused the resentment of the jury and was so realistically described as to lead them to believe that the defendants on trial before them were accomplices after the fact of a heinous murder, rather than defendants charged with a misdemeanor. If any part of this sad and impressive story was forgotten during the course of a long trial, it was strongly revived by the summation of the prosecution and the court's charge. The court, with some inaccuracy of fact, stated: " Samuel Drukman was brutally murdered. The murderers were caught literally red-handed by the police who arrived at the scene before the culprits had an opportunity to wash away the blood from their hands. Surprisingly, the grand jury which had before it the evidence of the police who arrived at the scene of the murder so promptly, the evidence that has been introduced as an exhibit in this case, failed to indict. The murderers were freed into the streets of Brooklyn. The telltale bloody clothing, and the checks which helped to spell out the motive for the murder were returned to the culprits. As far as the guardians of the law apparently were concerned, the murder was to become an unsolved mystery." Then again, after the main charge, the court was requested to charge the jury that in arriving at a verdict they may not consider any of the details of the homicide. The court declined so to charge upon the ground that the jury may take into consideration the nature of the crime, its brutality, etc., in connection with the action of the April grand jury. On one occasion, while testimony was being presented and objection made thereto, the court stated: " The mere fact that there is some dramatic proof will not make it incompetent." On another occasion the court stated: " You have this to . consider: One of the charges is that

the grand jury failed to act because of the activities of these defendants," and then again: " Some one might claim that the grand jury failed to act because the grand jury did not think these defendants charged had committed the crime. But if the facts and circumstances were so plain as presented to them that a crime had been committed, that may have a bearing upon the determination of the other question," and thereafter the court· stated: " How about the fourteen men who voted against an indictment? " In other words, the court received this proof in evidence to indicate that somebody must have tampered with the grand jury, which failed to indict. The record in this case will be searched in vain for a single word indicating that any of the grand jurors was corruptly induced to do other than his duty. Fourteen voted in favor of dismissal; seven in favor of indictment. Among the seven who voted for indictment were Cohn and Rieke, the only two whose conduct was sought to be affected. The court in its charge to the jury said it made no difference whether the fourteen grand jurors who voted " no bill " in the Drukman case did so believing that they were doing wrong. That being so, then there was surely no necessity for going into the bloody details. There being no proof in the case that any of the grand jurors had been affected, the court said: " I have no doubt that at least a substantial number of the fourteen thought that they were doing the right thing," and also stated to the jury that in order for them to find that there was a conspiracy it was not necessary to find that the fourteen men who voted against indictment were dishonest. These statements clearly indicate that the trial court at the conclusion of the case thought differently than at the beginning. All that the People had to prove, at most, in so far as this prosecution was concerned, was: (1) that there was an April grand jury; (2) an inquiry by it into the murder of one Drukman; (3) the Luckmans and Hull were charged with the murder; (4) the grand jury was deliberating whether or not they should be indicted. None of the details of the murder was essential to prove that somebody was guilty of embracery or other act illegally to influence the grand jury. There could have been a determination without details of blood, bloody clothes, and a mutilated and tied-up body. The courts have consistently decried attempts to arouse the resentment of jurors by exposing to their view the concrete demonstrations of crime, unless absolutely necessary to make out a case. They have also condemned the practice of calling out evidence for one purpose, apparently innocent, and using it for another, which is illegal. (*People* v. *Zackowitz*, 254 N. Y. 192; *People* v. *Caruso*, 246 id. 437; *Walsh* v. *People*, 88 id. 458; *Smith* v. *Lehigh Valley R. R. Co.*, 177 id. 379.)

It is impossible to believe that some, if not all, of the jurors were not affected adversely to defendants by such an emphatic, lucid and reiterated presentation of a dastardly crime. It was error to have received this testimony in evidence, for it seriously prejudiced the defendants.

Another error assigned, which may have had a serious effect upon the jury's determination, was the receipt in evidence of the fact that Detective Charles C. Hemendinger committed suicide on April 24, 1936, about two months after the Luckmans and Hull were convicted of murder in the second degree; in other words, two months after the conspiracy had ended. Without discussing the proof in connection therewith, the validity of the claim of the People that this detective was a conspirator, of which there is no inconsiderable doubt, will be assumed. It was shown that on April 23, 1936, he was called for examination in the office of the Special Assistant Attorney-General in charge of the prosecution, and at the end of his examination was instructed to return the following day with his bank books and official records. Early the following morning he telephoned to Captain Carey, his superior, at his home, and told him that he had been questioned and accused of being Carey's " confidential man," and that he had to return to the prosecutor's office that afternoon for further questioning. That same day Hemendinger visited his safe deposit box. From ten-thirty the same morning until noon, he was seen by a neighbor under conditions which indicated nervousness, and about one o'clock he committed suicide with his service revolver. All of the foregoing was objected to. When it was sought to prove Hemendinger's suicide, it was objected to by all of the defendants upon the ground that it took place after the conspiracy had ended, and was, therefore, not binding on any of them. The court ruled that subsequent acts may be received to prove prior acts. Counsel for one of the defendants stated that it cannot be offered against any of these defendants, and said: " It can only be offered as against the man who does them." The court stated: " No, I don't agree with you. I will overrule the objection." The effect of the ruling was that proof of the suicide, on the theory that it was confession of a wrong in connection with the murder prosecution, was received as against all of the defendants. This is contrary to familiar and oftstated rules of law. (*People* v. *McQuade*, 110 N. Y. 284; *People* v. *Kief*, 126 id. 661; *People* v. *Ryan*, 263 id. 298; *Logan* v. *United States*, 144 U. S. 263; *People* v. *Storrs*, 207 N. Y. 147; *Garnsey* v. *Rhodes*, 138 id. 461.)

Of course, assuming that suicide at the time was in effect an admission by the detective of his participation in the conspiracy,

it would be proper to prove it as against him to show he was a conspirator, if he were at the trial, but as against him alone. It was error to admit it as against the other defendants. There was no proof that any of the appellants were in any wise connected with Hemendinger, but the jury was made to understand that the act of any one of the conspirators was the act of all of them. The People were prosecuting this case on the theory that a large number of persons were engaged in a common design to enable the Luckmans and Hull to escape the power of the law, and, therefore, what any one of them did was the act of the others. So by this ruling responsibility for what Hemendinger may have done as a conspirator had to be borne by these defendants. The defendants were prejudiced by this error.

Without referring to the same in detail, it is also our opinion that these defendants were prejudiced by the court's commendation of the witness Corbett, in effect admonishing the jury thereby that he was a reliable witness. Prejudice also arose from references to the right of defendants to appeal if the court made any errors, and to the *quantum* of punishment which could be meted out to the defendants — a limit of one year — intimating by the former that if the jury made a mistake the error might also be cured by an appeal, and by the latter that it was an easier and simpler burden to find guilt when the punishment was light than when it was heavy.

There are numerous other assignments of error alleged by the defendants, but it is impossible to discuss them all; if valid, there will not be a recurrence on a new trial.

It should also be carefully borne in mind that proof which only leads to surmise, conjecture or speculation is not valid proof and should be omitted; that only those are conspirators who have engaged in a common design to frustrate efforts to bring to justice the murderers of Drukman. To prove the conspiracy, it is not necessary to show actual agreement of the actors. It suffices if facts are shown from which a common effort may be inferred.

There remain, however, two other matters of great importance which require consideration. These involve the conduct of the trial court and the prosecuting attorney.

While the extraordinary grand jury was in session one Hogan was brought to the hotel chambers of the trial justice. Hogan had just come from a Federal prison, from which he had been released on parole after serving part of a term of imprisonment under a conviction in a Federal court growing out of certain immigration frauds. Hogan came from the prison with a representative of the prosecutor. A paper which had been or was then and

there prepared was signed by Hogan and he swore to it before the presiding justice at his rooms in the borough of Manhattan. It is claimed that the trial justice thus disqualified himself from presiding over the trial of any persons who might be brought before him under indictment of the extraordinary grand jury. The theory of this seems to be that the trial justice participated in the development of the People's case. This act of the trial justice did not disqualify him. He had the power to do what he did. However, it is our opinion it was an act which were better left undone. If, perchance, the affidavit became the subject of a controversy it might resolve itself into a question of fact between the affiant and the justice, especially where the matter involves the likelihood of a prosecution over which the justice may preside. It might become necessary for the justice to be a witness on the trial — a most undesirable situation to contemplate. If the affidavit were received in evidence, it might carry unwarranted weight because it was sworn to before the presiding justice.

The jury retired to deliberate at the court house shortly after midday on June twenty-sixth. Before breakfast the following morning — some time between two and three o'clock — the jury agreed as to the guilt of these appellants but were unable to agree as to the other two defendants. They then decided to continue to deliberate to see if an agreement could be reached with respect to the two other defendants. Shortly before seven o'clock, not having reached an agreement concerning the remaining two, the foreman wrote the court a note, which was handed to a deputy clerk for delivery to the justice. This was at six-fifty-five A. M. June twenty-seventh. The clerk of the court, who received the note from the deputy clerk, telephoned to Justice ROGERS at the Towers Hotel, where he was staying overnight, and told him that he had a note from the jury. Justice ROGERS instructed the clerk to open the note and read it to him. It was as follows: " June 27, 1936. Judge ROGERS: The jury have agreed on three defendants, but cannot agree on two defendants. We await your further instructions. A. E. Demeritt Foreman."

Justice ROGERS then instructed the clerk, over the telephone, to have the jury taken to breakfast and, according to the clerk's minutes, the jury was taken to breakfast at seven-thirty A. M., to the Towers Hotel, where the jury had been staying during the trial and had been having breakfast regularly in the roof garden. It was to the roof garden they were taken when instructions were given that they be taken to breakfast. Justice ROGERS that morning had breakfast in the roof garden of the Towers Hotel with Special Assistant Attorney-General Todd and his chief assist-

ant, Mr. Lombard. During their breakfast they were joined for a short time by the manager of the hotel, a personal friend of Justice ROGERS and Mr. Todd. As the jurors entered the roof garden Justice ROGERS, Mr. Todd and Mr. Lombard were seated at a table twenty or thirty feet away. Justice ROGERS nodded to the jurors as they entered. He did not rise nor speak to any of them, nor did Mr. Todd or Mr. Lombard do anything showing that they had noticed the presence of the jurors, although they were in sight of the jury. The table at which the jury breakfasted was on the opposite side of the room from that at which Justice ROGERS and the prosecutors sat. There were no other persons at breakfast there. Shortly after the jury entered the room Mr. Todd and Mr. Lombard finished their breakfast and left. Thereafter Justice ROGERS left his table, walked over to the table where the jurors were seated and addressed all of the jurors. Seven out of the ten jurors who made affidavits concerning the matter said that the justice asked, in substance, when they were going to return to the court house. One of them went so far as to state that it was said that they would be there in about an hour and the justice said: "Make it 9:15 and I will meet you there." This is in accordance with the recollection of the trial justice. It appears that Justice ROGERS, who during the trial had his quarters in a Manhattan hotel, had been invited by the manager of the Towers Hotel, who was his friend as well as the friend of Mr. Todd, to spend the night at the Towers Hotel. At about six o'clock in the morning of June twenty-seventh, Mr. Todd suggested to Mr. Lombard that they go to the Towers Hotel and refresh themselves with bath and breakfast, since they had been sitting up all night awaiting the return of the jury. Mr. Todd and Mr. Lombard reached the Towers Hotel shortly after six o'clock and were assigned to a room. Thereafter they went to the roof garden dining room of the hotel for breakfast. On reaching there they were informed that breakfast customarily was served in a room downstairs. They proceeded there and as they were leaving they met Justice ROGERS, who was also looking for a place to have breakfast. In his company they returned to the roof garden, where after some delay they were joined by the manager, who apologized for the lack of service and sent his personal waiter to serve them. Mr. Todd and Mr. Lombard both stated that they did not know the jurors were to be taken to breakfast at the Towers Hotel or that instructions had been given to take the jury to breakfast. Of course, Justice ROGERS knew that the jurors were to be taken to breakfast at the Towers Hotel, where they generally had their breakfast. Mr. Todd and Mr. Lombard say that they did not know this.

The justice, therefore, knew that there was a possibility of the jury observing him and the prosecutor together in the Towers Hotel. In our opinion that should have been avoided. Here was a vigorously fought case. The trial was long. Any indication of partisanship on the part of the justice might affect the jury. The trial court, during the trial, had made a statement indicating a complete confidence in Mr. Todd, the prosecutor. When this jury saw the trial court and the prosecutor and his first assistant breakfasting together, it is not unfair to assume that some of them may have received the impression that because of the expressed confidence of the court in the prosecutor and his association with him while the jury was at deliberation, the court was in favor of the prosecutor's side of the case. The inquiry is not as to why or how it occurred. The fact is that it did occur. Nor will a search be made to find the actual effect. No question is raised as to the good faith of the trial justice, but he could have avoided the situation by preventing the prosecutor and his assistant from dining with him in a place where he must have known it was likely that the jury would be. We take our statement of facts from the record and are unwilling to consider the claim of the appellants that Mr. Todd and his assistant knew that the jury had been and was at the Towers Hotel and that it is quite remarkable that they should have gone to that place on this particular morning when there were other convenient restaurants available. But it is said that at the time the justice and the prosecutor and his assistant were observed together by the jury, the jury had agreed as to three of the defendants. It will be assumed that it was these three appellants. A determination of a jury is not final until verdict rendered. It may be that in the minds of some of the jurors there was a lingering doubt as to the guilt of one or more of the appellants. The statement of facts with reference to them shows how close was the question of fact in the cases of the appellants. The appearance of the justice with the prosecutor may have had the effect of obliterating that lingering doubt.

The inquiry made by the trial justice as to when the jury would return to court was harmless, because the same inquiry might have been made by a court attendant under the instructions of the court.

There were references made to four communications had by the jury with the court, without the knowledge of the defendants. As to two of the communications, these defendants were not affected because they were received after the jury had in court rendered a verdict of guilty as to them, and during the time they were further deliberating as to the other two. One of the other communications

was the note already mentioned. There is some confusion in the record as to when the remaining note was received from the jury, although the court in the minutes states that it was received at a time after these appellants had been found guilty by verdict rendered. This statement is accepted and there will be consideration of the one note only. The note in question advised the court that the jury had agreed on three defendants but it could not agree on the other two. Again it will be assumed that the three referred to were the appellants against whom the verdict was rendered. While, of course, as a general rule every communication from a jury to the court, by which the jury seeks instructions or conveys information to the court with reference to the case, should be recorded and counsel for the defendant advised thereof, and if instructions are required they must be given after notice to the district attorney and counsel for the defendant, and in case of a felony, in the presence of the defendant, here the information conveyed to the justice was such that the failure of the court to notify counsel did not deprive appellants of any rights or do them any harm. There was no action counsel could take in behalf of their clients. While counsel should have been notified of this situation, we are unwilling to subscribe to a rule that any communication between court and jury, no matter what it may be, without knowledge of counsel, is reversible error. This situation is quite different from the one above discussed where the justice permitted the jury, after it had retired for deliberation, to see him and the prosecutor together.

Upon the review of these criticisms of the trial court and the prosecutor in connection with the jury, we are of the opinion that the only one of substance is the appearance together of the court, the prosecutor and his assistant, in the same room with the jury. This inopportune incident is an added reason why the judgment against Singer and Silverman should be reversed.

As to defendant Kleinman, the judgment and the order denying his motion to dismiss the indictment should be reversed on the law, the motion granted, and the indictment dismissed. The appeals from the remaining orders should be dismissed.

As to defendant Silverman, the judgment and the order denying his motion for a new trial pursuant to section 465 of the Code of Criminal Procedure, should be reversed on the law and the facts and his motion for a new trial granted.

As to defendant Singer, the judgment and the order denying his motion for a new trial pursuant to section 465 of the Code of Criminal Procedure, should be reversed on the law and the facts and his motion for a new trial granted. The order denying his

motion for an inspection of the grand jury's minutes should be affirmed. The appeal from the remaining orders should be dismissed.

As to defendant Kleinman: — JOHNSTON, ADEL, TAYLOR and CLOSE, JJ., concur.

As to defendant Silverman: — JOHNSTON, ADEL, TAYLOR and CLOSE, JJ., concur.

As to defendant Singer: — ADEL, TAYLOR and CLOSE, JJ., concur; JOHNSTON, J., dissents, with opinion, from so much of the decision as orders a new trial and votes to dismiss the indictment; otherwise, he concurs.

JOHNSTON, J. I join in the decision about to be made as to the defendants Kleinman and Silverman. I also agree that the judgment against defendant Singer must be reversed. I dissent, however, from so much of the decision as orders a new trial as to Singer and vote to dismiss the indictment as to him. Except as hereinafter indicated, I share the views expressed in the opinion of the learned presiding justice.

Concededly the testimony of Anzalone is the crux of the case against Singer. If it were true and not corroborated, the People's case falls. If it were untrue, the judgment against Singer should be reversed and the indictment dismissed. That his testimony was contradictory in at least one important particular even Mr. Todd, the Special Assistant Attorney-General, admits. That it was contradictory in other essential particulars is not disputed. After Anzalone was indicted and while he was in jail and unable to furnish bail, he requested an interview with an assistant to the special prosecutor. He had one and perhaps two interviews, and on March sixteenth made an affidavit and on the same day testified before the extraordinary grand jury. That the statements in his affidavit and his testimony before the grand jury were at variance with his testimony on the trial is admitted. Although at the trial the special prosecutor would not fix the date when Anzalone first communicated and had his first conference with Singer, it is now conceded the date was April twenty-ninth. In his affidavit Anzalone stated that Singer, in the latter part of April, called him on the telephone and asked him to come to his office. He made the same statement before the grand jury. This, he said, was the first communication from Singer. On his direct examination he testified he first learned Singer wished to contact him when he found a message on his desk, written by Nittoly, to that effect; and that he then telephoned Singer and at his request called at the latter's office, when Singer asked him to offer Cohn a bribe.

Neither in his affidavit nor before the grand jury did he mention that it was Nittoly who received the first message from Singer and left word for him to call Singer. On cross-examination he testified he personally received the first call from Singer. When he was reminded that on his direct examination he said the first call came through Nittoly, he admitted his testimony on direct was not true. Finally he said that, regardless of the statement in his affidavit (which is the same as his grand jury testimony) and his direct testimony on the trial, he personally received the first message from Singer. This is a most important element in the People's case because it was the People's contention that this call resulted in the conference at which Singer proposed that Anzalone attempt to corrupt Cohn. Moreover, if Anzalone's ultimate statement were true and he personally received the call, then obviously Nittoly's testimony furnishes no corroboration in that respect. Mr. Todd, in his affidavit in opposition to the motion for a new trial, while admitting the discrepancy between the statements in Anzalone's affidavit and grand jury testimony and his trial testimony, attempts to explain it by saying that his [Anzalone's] prior statements were made before he had an opportunity to discuss the matter with Nittoly and Sicilia, and as a result of subsequent discussions with them Anzalone's recollection was refreshed. Mr. Todd further states he therefore was satisfied that Anzalone's first communication with Singer was the result of a message left for him by Nittoly. The fact is that at the trial Anzalone testified he never talked to Nittoly at any time about his testimony so far as Singer was concerned.

In his affidavit and on his direct examination Anzalone stated Singer telephoned him a second time a few days after the first call and told him " not to bother, that the case had been adjourned." In his cross-examination he said he did not know whether he received the second call personally or through Nittoly. Later he testified he did not personally receive the second call but learned of it through a message written by Nittoly. While he admitted he did not so state in his affidavit he again testified the second message came through Nittoly.

In his affidavit he states that after the grand jury voted not to indict the Luckmans, Singer telephoned him to come to his office. He further states he did so and Singer told him that Cohn did not vote to dismiss. Nowhere in his affidavit does he state that Solovei was present at that conference, nor does he even mention Solovei. Nor did he so state when he again appeared before the grand jury on May 16, 1936. In fact, before the grand jury he testified that Solovei was not present and he never talked " about

this matter with Solovei." In his direct-examination he said Solovei was present and participated in the conversation. He further testified: " I don't remember just who said it, but they told me that, they said ' What the hell kind of a friend is this Teddy Cohn? There were 14 voted for [no] indictment and he did not vote at all.' I said: ' I told you in the beginning that the man would not go through with it. What do you want off me? '; and I walked out of the office." On cross-examination he explained that his failure to state in his affidavit that Solovei was present was due to a faulty memory. His testimony in this respect is palpably false. He also said that prior to the trial he never told any one, not even the men in Mr. Todd's office, that Solovei was present at his conference with Singer in the latter's office, and that the first time he ever told any one that Solovei was present was at the trial. Later, when asked why he did not tell Mr. Todd and his assistants that Solovei was present, he replied: " I did tell him about him. They know about it." He finally admitted that his first statement was not true and insisted he told a member of Mr. Todd's staff that Solovei was present. Mr. Todd, in his affidavit in opposition to the motion for a new trial, admits that when Anzalone appeared before the extraordinary grand jury on May 16, 1936, he testified that Solovei was not present at the interview with Singer. Mr. Todd also states that, " Subsequently and after further reflection on the matter, his [Anzalone's] recollection was different, and he testified before the extraordinary grand jury that Solovei was present at the conference." Mr. Todd further states that, as he believed Anzalone's later grand jury testimony and disbelieved his earlier testimony, he was under no obligation to call the earlier testimony to the attention of Singer.

Assuming, as the People contend, that this conference took place, it was another very important element in the People's case, because it confirmed the People's claim that Singer enlisted Anzalone to corrupt Cohn. The only evidence that there was such a conference was Anzalone's testimony. Singer and Miss Singerman denied there was any such conference. In view of his affidavit and grand jury testimony, it is impossible to credit Anzalone's testimony on the trial that Solovei was present at that conference, unless we are willing to accept his statement that he never thought of it until he testified at the trial.

In his affidavit Anzalone says: " A couple of nights later "— that is, after his first interview with Singer on April twenty-ninth — he called Cohn on the telephone and went to the latter's home and offered him $100 to vote against indictment in the Luckman case. In his direct examination he testified that he went to Cohn's home

and offered him the bribe on the evening of April twenty-ninth. If Singer sent him to corrupt Cohn, he surely would remember whether he went to Cohn's home on the very day he agreed to approach him or at some subsequent time.

On March twelfth, the day he was indicted, Anzalone saw his attorney, Mr. Turk. When asked if he wrote out a statement for Mr. Turk, he said he did not remember. Later he said he did make such a statement and signed it and left it with Mr. Turk. When asked if he had any objection to the statement being produced and received in evidence, the court, at Mr. Todd's request, advised him of his rights, and he refused to consent. Of course, this was his privilege, but under the circumstances his refusal is significant.

While I recognize that the State is neither required nor expected to discover and call witnesses of high character to establish the guilt of the accused, and that even a criminal may tell the truth, no court should permit a judgment based on Anzalone's testimony to stand. To do so would be a reflection upon the administration of justice. Of course, if Anzalone at one time had given one version of his contacts with Singer and on the trial had given another, and was corroborated, a jury question would be presented and an appellate court would not be justified in disturbing the verdict, unless it was against the weight of the evidence or clearly wrong. That, however, is not the situation here. Not only did Anzalone in his affidavit of March sixteenth give one version of his dealings with Singer and repeat it to the extraordinary grand jury and give a totally different version on the trial, but at the trial he admitted that his first sworn statements were true and his testimony at the trial to the contrary was false. The testimony of Nittoly, who was called to corroborate Anzalone as to the telephone calls, not from Singer but from Miss Singerman, his stenographer, is fully set forth in the opinion of the presiding justice. I will not repeat it but merely state that I do not agree that it is sufficient to connect or tend to connect Singer with the commission of the crime alleged. It is difficult to understand how it can be held that Nittoly's testimony corroborates Anzalone, or, even that a jury could so find, when Anzalone admitted that in several essential particulars his testimony, which Nittoly assumed to corroborate, was false, and in other particulars its falsity, though not admitted, is apparent.

It is stated in the opinion of the learned presiding justice that the rule concerning corroboration enunciated in the earlier cases was modified in *People* v. *Dixon* (231 N. Y. 111) and that the rule, as modified, is reiterated in *People* v. *Crum* (272 N. Y. 348).

Assuming this to be so, although the opinion in neither case so states, it is emphasized in the two cases cited that the corroborative evidence must tend to connect the defendant with the commission of the crime in such a way " as may reasonably satisfy the jury that the accomplice is telling the truth." Obviously no jury could be satisfied from anything that Nittoly said, assuming he was worthy of belief (and he was a convicted perjurer and forger, with a forceful motive to injure Singer), that Anzalone told the truth at the trial, because Anzalone admitted he did not tell the truth, and even if he made no such admission his perjury is clear.

In *People* v. *Ledwon* (153 N. Y. 10) the defendants were charged with homicide in the first degree. The jury found one guilty of murder in the second degree and the other of manslaughter in the first degree. The evidence of the People in the main was furnished by a small boy. His statements were contradictory, he having testified different ways on the question of whether the deceased committed suicide or whether he was choked to death by the defendants. The court said: " So long as the burden is upon the People of not only removing the presumption of innocence, but of establishing the guilt of the accused beyond a reasonable doubt, a mere *scintilla* or even *some proof* is not sufficient to warrant the submission of the case to the jury. (*People* v. *Owens*, 148 N. Y. 648.) It follows that whenever a criminal charge is submitted to the jury upon such proof, against the objection and exception of the defendant, a question of law is presented. We think that in this case it must be held, as matter of law, that the proof was of that character and fell so far below the standard prescribed by the statute that the case should have been withdrawn from the jury." The court further said: " The maxim, *falsus in uno, falsus in omnibus*, must still be given some force as a legal principle. Whatever qualifications may have been attached to it in modern times, we think this is a case for its practical application. To hold that this verdict and judgment, based as they are upon testimony conceded to be involved in ' hopeless contradictions,' are beyond review in this court, would be a reproach to the administration of justice. The defendants were, under the plain provisions of the statute, entitled to have the jury directed by the court to acquit. The request was made in substance, and the refusal of the court to grant it was error."

What was said in the *Ledwon* case applies, at least with equal force, to the instant case.

No jury and no court can say what part of Anzalone's testimony is true, and the presumption of innocence was not and never can be removed by such evidence and guilt established beyond a reason-

able doubt. In my opinion Anzalone's testimony was not only unbelievable but incredible as matter of law. It is still the law that "Insufficient evidence is, in the eye of the law, no evidence." (*Matter of Case*, 214 N. Y. 199, and cases cited; *Serina* v. *New York Railways Corp.*, 238 App. Div. 302.) Therefore, as there was no evidence upon which to base a verdict of conviction against Singer, he was entitled to have the jury directed to acquit him, and the indictment against him should be dismissed.

To order a new trial is futile, for it is inconceivable that any court would sustain a conviction based on the inconsistent and contradictory testimony of Anzalone, who is a confessed criminal and an admitted perjurer and who has demonstrated that he is unworthy of belief. The conclusion is irresistible that his motive in testifying on the trial that one or more of the telephone messages were received by Nittoly and relayed to him was to make the latter available as a corroborating witness. Without Nittoly he could be of no aid to the prosecution and would not have gained the immunity which he was promised and received.

As to defendant Kleinman, judgment of conviction and order denying motion to dismiss the indictment reversed on the law, motion granted, and indictment dismissed. Appeals from remaining orders dismissed.

As to defendant Silverman, judgment of conviction and order denying motion for a new trial pursuant to section 465, Code Criminal Procedure, reversed on the law and the facts and motion for a new trial granted.

As to defendant Singer, judgment of conviction and order denying motion for a new trial pursuant to section 465, Code Criminal Procedure, reversed on the law and the facts and motion for a new trial granted. Order denying motion for an inspection of the grand jury's minutes unanimously affirmed. Appeal from the remaining orders dismissed.