John H. BAILEY, Defendant below,
Appellant,

v.

STATE of Delaware, Plaintiff below,
Appellee.

Supreme Court of Delaware.

Submitted June 14, 1976.

Decided Aug. 11, 1976.

Morton Richard Kimmel and Paul H. Spiller, of Kimmel, Spiller & Bradley, Wilmington, for the defendant below, appellant.

Richard J. McMahon, Deputy Atty. Gen., Wilmington, for the plaintiff below, appellee.

Before HERRMANN, Chief Justice, DUFFY and McNEILLY, Justices.

HERRMANN, Chief Justice.

The defendant, John H. Bailey, was indicted for murder in the first degree and for possession of a deadly weapon during the commission of a felony. After trial by jury, he was convicted of manslaughter and the felony-weapon charge, and was sentenced to imprisonment for 30 years for the manslaughter and 10 years for the felony-weapon offense, the sentences to run consecutively.

The defendant appeals on 12 grounds. In considering those grounds, a brief overview of the State's case and the defendant's case is helpful.

### The State's Case

The victim, Sheila Ferrell, a twelve year old girl, was shot in the back at about 6:50 p. m. on Sunday evening, August 17, 1975. When shot, the victim was being chased by the defendant whose house was located about one-half block from the scene of the shooting. The chase began when the defendant became enraged by the belief that the victim, together with others, had stolen furniture and furnishings from his house or fruit from a peach tree in his backyard.

Five eyewitnesses testified that the defendant pointed a gun at the girl during the chase and shot her in the back, after firing a first shot and shouting a warning to stop.[1] The defendant continued to chase the girl until she collapsed on the porch of her house one block away. The defendant fled the scene after informing bystanders that the girl had stolen his furniture.

The police, on the scene within 10 minutes after the shooting, were provided with a description of the assailant and the license number of his car. The license number was traced to the nearby residence of the defendant's parents. The police arrived there within 45 minutes of the shooting, but were refused entry by the defendant's wife. After she was told what they wanted, she asked the police officers "What are owners to do when people tres-

---

[1.] Darryl Wright, age 16, testified:
"Well, he [the defendant] took and got out of the car and said come down from the peach tree, and they all start running, jumped off the garage roof, and the girl, she took and ran, and then he took and ran after her till he got to the corner, and he said, 'Stop or I'll shoot,' and he shot her."
Dwayne K. Stewart, age 11, testified:
"First I saw * * * the man [the defendant] take one shot, and he said, 'Halt before I kill you,' and he kept on running, and then he shot her."
Velencia Weddington, age 14, testified that she heard the defendant shout at the victim "Stop or I'll kill you" or "some thing like that;" that the defendant "held his hand out" and then she heard something "that sounded like a firecracker."
William Ransom, age 13, testified " * * * he [the defendant] stopped at the corner, he held up his gun with two hands, and he says, 'Stop or I'll kill you,' and he shot her."
Willie Johnson, age 19, testified:
" * * * he [the defendant] stopped and extended his arm. * * * I seen a pistol in his hand. * * * I heard another shot, I saw a little smoke, and Sheila clenched her chest."

pass and pick peaches?" and then stated that her husband was not in the house. A search warrant was obtained and a search of the house began at about 9:00 p. m. The defendant was found hiding in the attic above the garage. The vehicle which had been identified at the scene of the shooting was found in the garage with the hood up; it appeared that someone had been working on the car.

Upon being found in the attic, the defendant was then and there given his Miranda warnings twice. The police officers then asked the defendant what he had done with the gun he had at the scene of the shooting. The defendant stated that he had thrown it in the river near the police pistol range. When the officers questioned the opportunity and time available since the shooting to accomplish such disposal, the defendant stated that he thought he should get some advice. No further questions were asked. A search of the house revealed an empty box which, according to its label, had contained a .25 caliber semi-automatic pistol; also found were a supply of ammunition for the pistol and miscellaneous other types of ammunition.

At the trial, the defendant admitted attempting to create the false impression that his car had been in the garage for some time. He explained this action and his hiding as a stall for time until his father arrived home, stating that it was his hope that his father could act as a mediator for him with the police. He also testified that he did not have a gun at the scene of the shooting and had only told the police that he had thrown the gun into the river so that they would let him out of the attic alive.

Expert testimony was adduced to the effect that the course of the bullet that struck the victim was consistent with the accounts of the eyewitnesses.

### The Defendant's Case

The defendant denied shooting the victim. He testified that in 1974 he gave the .25 caliber pistol to his brother, a resident of Florida, and that he has not owned a gun since. He admitted chasing the victim, angered by the trespasses on, and theft of, his property; but asserted that he carried a door handle in his hand, not a gun, as he ran. He testified that a "black man", whom he identified as Willie Johnson, an eyewitness for the State, was standing on the route of the chase and that it was Johnson who shot the victim by accident in an attempt to shoot the defendant. The defendant testified that he ran away and hid because he feared the violent results of the suspicions he knew had centered upon him.

A defense witness testified that he saw a "black man" standing on the route of the chase, with an unidentified object in his hand and smoke swirling about him, as the defendant and the victim ran by.

The defense adduced expert testimony intended to show that the course of the bullet was not consistent with the testimony of the eyewitnesses.

The defense attempted to turn the trial into a trial of the police. It was claimed that, in order to placate public outrage, the police attempted to make the defendant a scape goat. In summation to the jury, defense counsel referred to a police "cover-up", and labelled the police work in this case "the Wilmington Watergate"; and counsel stated that "this is the greatest conspiracy in the history of the State of Delaware." In support of these statements, the defense asserted that the police failed to conduct routine investigative practices and procedures, which would have established the defendant's innocence and may have established the guilt of Johnson, such as the failure to promptly and properly search for the spent bullet and the gun used; the manner of handling a .32 caliber casing, found in the street on the route of the chase; and the failure to take the defendant's fingerprints and to make paraffin and other tests of his hands and clothing designed to show the handling

of a recently fired pistol. The defense also attacked the conduct of the police, during the search of the house and the confrontation there with the defendant and his wife, as being antagonistic and presumptive of the defendant's guilt.

In the development of the attacks upon police investigative practices and procedures, the motivation, good faith, and credibility of the investigating police officers were brought into issue.

## I.

The defendant asserts as reversible error the denial by the Superior Court of a motion for new trial based upon certain events involving investigating police officers who testified as witnesses and sat at counsel table with prosecuting attorneys during the trial. See opinion below, 352 A.2d 415.

A post-trial evidentiary hearing was held on the motion for new trial. Thereupon, the following factual findings were made:

"After the jury had been sequestered and begun to deliberate, it was conducted to the DuPont Hotel, one block from the Court House, for dinner. Three uniformed bailiffs had been sworn as being the bailiffs officially in charge of the jury. During the dinner hour, three sworn bailiffs were joined by the chief bailiff, two or three additional uniformed court bailiffs, two court security officers and four Wilmington police officers in conducting the jury on foot to the hotel grill room and guarding them during dinner."

\*　\*　\*　\*　\*　\*

"[T]he jury went to the hotel in a compact group with uniformed bailiffs leading the way and bailiffs bringing up the rear. With the bailiffs was one or both the Superior Court security officers. On a parallel sidewalk, perhaps 15 feet away, the police officers guarded the flanks without having any personal contact with the jurors."

\*　\*　\*　\*　\*　\*

"During the meal, the jury sat at one large table by themselves and all of the court personnel, together with police officers, sat at a separate large table about 15 or 20 feet away."

"At the table occupied by the court personnel were the bailiffs, the court security officers and the police officers as well as the official court reporter and the presiding judge. The judge who joined the group at the hotel, did not sit next to any of the police officers, and his part of the table was not clearly visible from the jury's table due to a post and a partition."

\*　\*　\*　\*　\*　\*

"When the jurors left the table to help themselves at the self-serve salad buffet table no police officers mingled with the jurors. Instead, the chief bailiff stood informal guard near the salad table and two police officers stood informal remote guard near the exits of the grill room. Later, the judge went to the salad table with some court personnel, but not with the police officers."

\*　\*　\*　\*　\*　\*

"At no time did the jurors have any personal contact with the police officers, but the jurors could have observed the seating arrangements and might have noticed that the police officers were supplementing the bailiffs in guarding the jury." (352 A.2d at 416–18).

The motion for new trial was founded upon the assertion that the defendant's due process right to fair trial by an impartial and unbiased jury was violated in that:

1) Defendant was prejudiced because the police officers who took some part in

guarding the jury at supper had been important witnesses for the State, and

2) Defendant was prejudiced because the jury saw (or could have seen) the Judge having dinner at a table where the four police officer witnesses were seated.

The defendant contends that this situation was especially prejudicial to him because the actions of the police witnesses as "protectors" or "guardians" of the jury tended to ingratiate them in the eyes of the jury, and the association with the Trial Judge tended to enhance their credibility and destroy that of defense witnesses. The argument goes that the action of the Trial Judge in dining at the same table with the police witnesses "had the force of conveying an opinion on the merits of the case to the jury"; that, under all of the circumstances, "[E]ating dinner at the same table with the Trial Judge could only mean to the jurors that the police officers were credible and the defense witnesses were not."

In denying a new trial, the Superior Court [2] concluded:

(1) "That the defendant has failed to show any prejudice to the defendant on account of the remote guarding conducted by the police witnesses"; and (2) that there was no prejudice to the defendant because there "is no indication that he [the Trial Judge] was actually socializing with these witnesses at the meal or at any other time and there was every indication the eating arrangements would have been viewed by the jury as a matter of physical convenience and not a matter of social choice."

For the reasons stated by the Superior Court, *inter alia,* we agree with its conclusion that there has been no violation of the defendant's due process rights and that he is not entitled to a new trial on that ground.

Supplementing the rationale of the Superior Court: The defendant made no effort to show actual prejudice. The question then becomes whether the factual situation gave rise to an inherent prejudice as a matter of law. We think not, for the following reasons:

The State's case against the defendant, founded as it was upon the testimony of five eyewitnesses, was a strong case. None of the testimony of the police witnesses contradicted the eyewitnesses or was otherwise addressed to the foundation of the State's case. The testimony of the police witnesses was addressed to collateral matters, such as the conduct of the defendant and his wife at the time of the arrest, the fruits of the search of the house, and the nature and scope of the police investigation. Such testimony was not essential to the State's case. The conviction of the defendant would stand on a solid foundation were it based on the testimony of the eyewitnesses alone, without more. Thus, since the credibility of the police witnesses was not essential to the validity of the jury's verdict, no inherent prejudice may be found, as a matter of law, in the factual situation before us.

Moreover, the practicalities of the situation explain the circumstances of the occurrence which might have otherwise been more difficult to understand. This homicide created severe racial tensions in the community. Special precautions were taken throughout the trial for the protection of the jury. On the evening in question, as the jury prepared to leave the Court House for dinner, persons were seen loitering suspiciously in the area. Thus, we find the actions of the police witnesses on this occasion to be understandable, as practical security and administrative measures. We think that any reasonable observer, including the members of this jury, would have so concluded.

---

**2.** Under the circumstances, the motion for new trial was neither heard nor determined by the Trial Judge.

In the final analysis, the alternative would have been to summon other police officers, colleagues of the police witnesses, to protect the jurors during the dinner hour. Similarly, any such guardianship could be said to have given rise to personal gratitude on the part of the jury and to have enhanced the credibility of police witnesses. We think, therefore, that the problem here is a matter of degree and as a practical matter it cannot, and does not, rise to the level of an inherent prejudice or basic unfairness as a matter of law.

The defendant relies upon *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L. Ed.2d 424 (1965), where inherent prejudice and denial of due process were found in a situation in which deputy sheriffs, who had custody of, and continuous and close contact with the jury throughout their deliberations, had obtained the confession of the accused and had corroborated the confession as witnesses at the trial. *Turner* is inapplicable on its facts. Also factually inapposite are other cases relied upon by the defendant: *People v. Silverman*, 252 A.D. 149, 297 N.Y.S. 449 (1937) (prosecutor and judge ate breakfast in the hotel dining room where the jury was also dining); *Veal v. State*, Tenn.Supr., 268 S.W.2d 345 (1954) (trial judge shook his head in disagreement with witness without explaining to the jury what caused his action); *People v. Butler*, 23 Ill.App.3d 108, 318 N.E.2d 680 (1974) (a prosecution witness was bailiff and in charge of jury throughout trial); *State v. Wroth*, 15 Wash. 621, 47 P. 106 (1896) (trial judge visited jury room); *State v. Tyarks*, Miss.Supr., 433 S.W.2d 568 (1968) (deputy sheriff, who testified for prosecution, had custody of jury throughout the trial); *Guzzi v. Jersey Central Power & Light Company*, 36 N.J. Super. 255, 115 A.2d 629 (communications between judge and jury outside the courtroom). Other cases cited by the defendant are equally inapplicable on their facts.

■ Our failure to find actual or inherent prejudice in the action of the police witnesses here does not mean that this Court approves such action. We presume the good faith of the police witnesses however, they were volunteers in this situation; they had not been requested by the Court to assist the sworn bailiffs. The integrity of the jury is the primary responsibility of the Trial Judge and the sworn bailiffs to whom he delegates that responsibility. The appearances of propriety are often as important as propriety itself. Other police officers should have been sworn as bailiffs, if needed to escort and protect the jury in public places. The police witnesses should have remained completely aloof from the jury and should have dined elsewhere, just as other witnesses and counsel in the case were obliged to do. Slightly greater contact with the jury, or a member thereof, may well have required a reversal and repetition of the 4½ week trial in this case. Police witnesses, however well intentioned, are cautioned against repetition of the course of action which was followed here.

There being no actual or inherent prejudice demonstrated in this situation, there is no denial of due process and reversible error shown.

## II.

■ The defendant contends that the Trial Court erred in denying the defendant's motion for a mistrial based upon certain statements of the prosecution during closing arguments to the jury.[3] The sub-

---

3. The statements claimed to be impermissibly prejudicial were the following:
  "Now, there is one more important point as to John Bailey's testimony, and I submit to you that this is probably the most probative of all the points, and I ask you to think about this seriously and try to understand what it indicates. At a point in this trial, John Bailey indicated that he did not do the shooting, that it was Willie

mission is that such remarks impermissibly prejudiced the defendant in that they infringed on his Miranda right to silence, citing *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975); *Sands v. State,* Okl.Cr.App., 542 P.2d 217 (1975).

The State contends that the prosecutor's remarks, when completely quoted and read in context,[4] were clearly addressed to the strategy of the defense during the trial, and not to the silence of the defendant prior to trial. The State argues that the remarks were meant to attack the apparent defense strategy of blaming the shooting upon an unnamed "black man", rather than upon Willie Johnson whose name came out as the assailant only during the cross-examination of the defendant; and that such was the only reasonable meaning of the remarks, taken as a whole.

> Johnson who did the shooting, and the most important thing about this is, when he finally indicated that, did he indicate it before the trial started? Did he indicate it on direct examination? Did he take the first opportunity to shout it out? Did he take the first opportunity to point to Willie Johnson and say, 'He did it'? Did he take the first question that his own attorney asked him about anything about this man and say, 'Wait a minute, I'm on trial for my life, and it was Willie Johnson that did that'? No, he didn't. He waited until cross-examination, until Mr. Denney said it to him specifically, after asking him to describe the man and everything else, he then said, 'Was it Willie Johnson, Mr. Bailey?' And he said, 'Yes, it was Willie Johnson.' "

4. "Here is a man on trial for his life and he feels that he has enough evidence to indicate that it was somebody else and you have to drag it out of him. You literally have to put it pointblank to him or else he would have never said it.
The State obviously did not have to ask that question and it was only by a direct question that that answer came out.
So why, you say? Well, what does that have to do with it? He still said it was Willie Johnson, didn't he?
Think about what the defense has presented to you. They present to you that it was a black man, a mystery man, someone that Klein didn't see him till, 'boom!' he was there.
Where did he come from? Where did he go? What did he do with his gun? These are questions you are not going to worry about too much, but it is going to cross your mind and you are going to think. 'Why would that man do it?' You are not going to dwell on that question too much because you don't know the first thing about this man. This *was just* some black man, and if there was some black man *there, why* didn't anybody in the neighborhood see him? If he was going to get that involved in this thing, wouldn't he be somebody that lived in this neighborhood, or something? Didn't somebody see him?
Well, the defense goes along and through cross-examination of witnesses and through little implications that Mr. Klein makes and that Mr. Bailey makes, they try to solve that problem for you in a very subtle way. They have to get it into your mind, but they don't want to present you with it fully. They try to have you thinking for that little problem of where did this guy come from and all. They tried it without stating it, let you come to the conclusion. 'Oh, it was Willie Johnson; that explains it.' But they don't want to say to you that it was Willie Johnson unless they absolutely have to. And why don't they want to say to you it is Willie Johnson? Because it is so preposterous when you really get down—once that man comes out and once that is the specific accusation, it is no longer the mystery man; it is now Willie Johnson. You look at it now and say, 'Wait a minute, Willie Ransom saw him go out of the house after the shooting; he saw him go up the side of 34th Street.' That is what Willie Johnson said he did. He heard the first shot. That is what attracted his attention.
Willie Johnson got there, and he was concerned about the girl and waited for the ambulance and talked to the police right away. And what opportunity did Willie Johnson have to get rid of whatever gun he had?
Well, they didn't want you to look at it that way. They only wanted you to use Willie Johnson for one limited purpose, just to have a name, a possibility to shove the problem with a mystery man out of the picture, to say, 'Well, it could have been Willie Johnson,' but they didn't want you to have to confront the fact that their case is based on the fact it was Willie Johnson because they know that you are aware of so many facts that make that hypothesis utterly ridiculous that they don't want to really confront it. That is why it had to be literally dragged out of John Bailey on cross-examination."

We agree with the State's view of this matter. There is no reversible error on this ground.

## III.

■ The defendant contends that the Trial Court committed prejudicial error in refusing to sequester the jury during the trial.

Jury sequestration is a matter of judicial discretion. *Super.Ct.Cr. Rule* 24(f). We find no abuse of discretion and, in the absence of a showing of actual prejudice, we find no reversible error. See *Anno.*, 21 A.L.R.2d 1088, 1105.

Again, however, we take the occasion to issue a caveat. This was a capital case surrounded by racial tensions. Fortunately, there was no mishap which may have required a wasteful repetition of this lengthy trial on the grounds of jury interference. In our opinion, sequestration in this type of situation would have been advisable during the entire trial, as protection against any such mishap.

## IV.

■ The defendant contends that the Trial Court erred in refusing to charge the jury on assault in the first, second, and third degrees, for the reason that a question of fact was presented to the jury as to whether the victim's death was caused by the gun-shot wound or by the failure of a hospital nurse to reconnect a respirator 12 days after the shooting, citing *State v. Fleetwood*, 6 Penn. 153, 65 A. 772 (1906); *Feliciano v. State*, Del.Supr., 332 A.2d 148 (1975).

We find no reversible error in this ground.

## V.

The defendant argues, as other grounds for reversal, that the Trial Court erred:

A. In denying the defendant's motion for change of venue.

B. In admitting into evidence the statement obtained from the defendant at his parents' home, without a knowing waiver of his *Miranda* rights.

C. In requiring the defendant's wife, when called by the State, to testify regarding her conversations with the police, in violation of a husband-wife privilege.

D. In permitting the State's expert witness to testify regarding the origin of the shot and a police-witness to testify as an expert on ballistics.

E. In commenting on the evidence during the jury charge in violation of Del. Const., Art. IV, Sec. 19.[5]

F. In charging on manslaughter without sufficient supporting evidence.

5. The comments complained of were the following:
"An intention to kill may be shown in various ways, for example, by showing lying in wait, prior threats, a *chase*, other circumstances which show an intention to kill when the fatal attack is made upon the deceased."
"'In considering whether a voluntary willful act has a direct tendency to destroy life, you are instructed that where a person selects a deadly weapon or a sharp or heavy instrument or firearm and uses it against another, a jury may find that such use has a direct tendency to destroy life."

"No mere entry onto land or the property of another, however right or wrong it may be, can justify or excuse resorting to the use of a deadly weapon."
"It is not necessary that the weapon be recovered after the commission of a felony for you to find that it is one from which a shot may be discharged. If you find that the weapon, when in the possesssion of the defendant during the commission of a felony, actually discharged a shot, then you may find that such weapon was a deadly weapon within the meaning of the statute."
"It is not unusual for a criminal case to rely upon circumstantial evidence."

G. In charging on "flight," without telling the jury that the defendant had returned from without the State when on bail and informed of the victim's death.

We find no reversible error on any of these grounds.

## VI.

The defendant contends that the "defendant's presumption of innocence was destroyed because of the publicity before trial, during trial, the failure of the Court to sequester the jurors, and the association of the chief investigating officers guarding and protecting the jury after the case was over but before the verdict."

Here, in effect, the defendant argues that the sum of several errors claimed is greater than any component.

We are unable to agree.

\*    \*    \*    \*    \*    \*

Affirmed.