**Robert D. HUGHES, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: Sept. 10, 1984.

Decided: Feb. 25, 1985.

Randy J. Holland (argued), Michael J. Rich, of Morris, Nichols, Arsht & Tunnell, Georgetown, and Gerald I.H. Street, Dover, for appellant.

Charles M. Oberly, III, Attorney General (argued), John A. Parkins, Jr. and James B. Ropp, Deputy Attorneys General, Wilmington, for appellee.

Before HERRMANN, C.J., HORSEY and CHRISTIE, JJ.

CHRISTIE, Justice.

In early 1980 defendant Robert D. Hughes was tried and convicted of murder in the first degree by a jury in the Superior Court, Kent County. On appeal, this Court, sitting en banc, reversed the conviction and remanded the case to Superior Court for a new trial.[1] At the second trial in July of 1982, a jury again found Hughes guilty of murder in the first degree. Defendant now appeals from that conviction.

The publicity surrounding the prosecution and trials of the defendant was extensive. Media coverage prior to the second trial focused not only on a recitation of the facts of the alleged crime but also contained prejudicial information in regard to the prior conviction of Hughes, the prior imposition of a life sentence, and his later rejection of plea bargains. Before the second trial, motions for a change of venue and jury sequestration, and a request for individual voir dire of each prospective juror were denied by the Superior Court. In addition, various motions for mistrial were denied during the course of the second trial.

Approximately 112 prospective jurors were assembled for the trial court's voir dire, which proceeded in the following manner:

THE COURT: Ladies and gentlemen, we are about to select a jury in the case entitled the State of Delaware vs. Robert D. Hughes. This case involves the murder of Serita Hughes who was found outside her home in Milford, Delaware, on August 31, 1976. The cause of death was strangulation.

The clerk will ask certain questions of you and read certain statements concerning the names of witnesses who will testify. After that I will ask certain questions of you and make certain explanations about the questions. Please listen very carefully to everything that is said by the clerk and by myself. All right.

---

1. *Hughes v. State,* Del.Supr., 437 A.2d 559 (1981). This prior opinion states the facts surrounding the alleged crime "at more length than usual." We will not repeat the basic facts here, even though there was some additional evidence presented at the second trial.

THE DEPUTY PROTHONOTARY: We estimate that this trial will take four weeks.

Do you know anything about this case either through personal knowledge, discussion with anyone else or the news media?

Do you know the defendant or his friends or relatives?

The State is represented by Charles M. Oberly, III and James E. Liguori, Deputy Attorneys General; and the defendant is represented by Gerald I. Street and G. Francis Autman, Jr.

Do you know the attorneys in this case or any other attorney or employee in the offices of the Attorney General or defense counsel?

Do you know any of the following persons who might be called to testify as witnesses: [62 names were read].

Do you have any bias or prejudice either for or against the defendant?

Is there any reason why you cannot give this case your undivided attention and render a fair and impartial verdict?

THE COURT: Are you now or have you ever been related to anyone on the Attorney General's staff?

Are you now or have you ever been related to a police officer?

Are you now or have you ever been connected with any law enforcement agency?

Do you have now or have you ever had immediate relatives or close friends connected with any law enforcement agency?

Does your present job or has any past job ever caused you to work with the Delaware State Police and/or the Milford Police Department?

Are you now or have you ever been or is anyone related to you ever been affiliated with or a member of any auxiliary police organization?

Have you now or have you ever been a member of any group organized principally for law enforcement?

Did you know the deceased Serita Hughes during her lifetime or know any members of her family?

Were you related to her in any way?

Have you discussed this case with anyone or been present when anyone discussed the case?

Have you ever expressed an opinion about the case or formed or expressed an opinion concerning the guilt or innocence of the defendant?

Let me make one statement by way of explanation. The clerk read to you a question and I have alluded to it: Have you heard anything about the case or have you read anything about it in the press? You should not respond to this question if you merely know this is a pending case. What we are after is if you have read anything or heard anything about the case which has caused you to form an opinion concerning the case and which would make you unable to sit as a fair and impartial and open-minded juror in this case. Keep this in mind as you answer and respond to these questions that this is what we want to know.

We want to know if because of one of these questions you cannot sit as a fair and impartial and open-minded juror. Both the State and the defendant are entitled to that. They are entitled to have twelve jurors whose minds are not made up about the case, who are not subject to outside influence. The mere fact you may have heard that this is a pending case wouldn't disqualify you and wouldn't require you to answer. It is whether or not you have read or heard anything that would affect your ability to be a fair and open-minded and impartial juror.

With that explanation, if your answer to that question is yes or the answer to any of the other questions that were read to you by the clerk or by me are in the affirmative, please come quickly and quietly forward and give your name to

the clerk. Do not hold a conversation with her. Just give her your name.

These questions and comments by the court and Prothonotary constituted the complete text of the pertinent voir dire prior to the routine selection of the jury.[2] Before the jury was sworn, these questions and comments were repeated to the persons ultimately selected.

Fifty-six persons responded affirmatively to the court's initial inquiry and were excused without any further questioning. No jurors responded affirmatively to the second questioning. The entire jury selection process was completed in approximately two hours.

Much of the evidence presented during the second trial was substantially the same as that which had been presented at the first trial. The most significant difference between the trials was that defendant testified at the second trial whereas he had not done so at the first trial. Following a six-week trial, Hughes was convicted for a second time of murder in the first degree after the jury had deliberated for about 4 hours.

Defendant filed a motion for a new trial setting forth many of the arguments which he now presents on appeal. This motion was denied by the trial court.

Defendant subsequently filed a new motion for reargument and sought a hearing to determine whether several jurors had violated their oaths. These applications were accompanied by affidavits tending to indicate that jurors were aware that Hughes had been previously convicted and that he had taken a polygraph examination, and that jurors had discussed these matters prior to their deliberations. These applications were denied.

On appeal after the second conviction this Court remanded the case to the Superior Court for a full evidentiary hearing as to extraneous prejudicial information which might have been improperly known to the jurors. 474 A.2d 140.

After a hearing, the Superior Court concluded that no extraneous prejudicial information had been brought to the jury's attention and that the jury had, in fact, been impartial.

However, our review of the transcript of the post-conviction hearing reveals the following:

(1) Four jurors and two alternate jurors knew, before trial, that the defendant had been convicted of first degree murder in a previous trial involving the same killing;

(2) At least one juror knew, before trial, that Hughes had taken a polygraph examination;

(3) At least one juror learned about defendant's prior conviction for the first time in the jury room. This testimony is corroborated by three other jurors who also heard discussion as to the defendant's prior conviction;

(4) Two jurors remember hearing discussions relating to Hughes taking a polygraph examination, for the first time, in the jury room. This testimony is corroborated by two other jurors, one of whom believes that a juror responded to an inquiry concerning the results of the polygraph by stating, "I think he failed it."

(5) At least one juror learned about defendant's prior murder conviction in the courtroom;

(6) The alternate juror who had initially contacted the defense attorneys about juror improprieties testified that she waited six weeks before doing so because she was not sure that discussions about the defendant's prior conviction and his submission to a lie detector test were improper.

The case is now before this Court for review of the second conviction in view of the record made at the second trial, the

---

**2.** A few routine questions were put to individual jurors who had failed to give full information about themselves in response to the questionnaires sent to all prospective jurors.

post-trial record made by the trial court, and the report thereon from the trial judge. Defendant-appellant raises several issues on appeal. Foremost among these is his contention that a fair and impartial jury was not impanelled in this case.

I

■ The accused's right to a trial by a jury of his peers is fundamental to our criminal justice system. *Irvin v. Dowd,* 366 U.S. 717, 721, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). An essential ingredient of that right is that the jury consist of impartial or indifferent jurors.[3] *See Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *In re Oliver,* 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948).

■ It should be apparent that the jury's verdict was based solely on the evidence presented at trial, and that defendant was able to exercise his due process rights of confrontation and cross-examination in the courtroom with the aid of his counsel. *Turner v. Louisiana,* 379 U.S. at 473, 85 S.Ct. at 550. Only in these circumstances is the accused afforded a full opportunity to challenge the evidence which is offered against him. He thereby seeks to assure the accuracy of the testimony which the jurors hear and the fair consideration of such evidence. As we have stated, "[I]ndeed, if only one juror is improperly influenced, a defendant in a criminal case is denied his Sixth Amendment right to an impartial jury." *Styler v. State,* Del.Supr., 417 A.2d 948, 951–2 (1980).

■ It is not required, however, that each juror be completely ignorant of the facts and issues involved in a particular case. Such a requirement would be practically unattainable. The Supreme Court has held that a prospective juror's knowledge of the facts and issues of the case, or even a preconceived notion of guilt or innocence of a criminal defendant, will not automatically disqualify a juror. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). We note, however, that the Supreme Court went on to say that this standard should not be applied so as to infringe upon the due process rights of an accused. The Court explained that "... the test is 'whether the nature and strength of the opinion formed are such as in law necessarily ... raise the presumption of partiality.'" *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1643.

■ In the present case it is now clear that some jurors were aware, prior to trial, that the defendant had been previously tried and convicted of the offense which became the subject of a retrial. At least one juror had heard that defendant had taken a polygraph examination. Furthermore, testimony indicated that these matters were improperly discussed among the jurors prior to their deliberations, thereby allowing other "untainted jurors" to acquire knowledge of this information. The issue which confronts this Court is whether the knowledge of these inadmissible facts was so prejudicial as to actually indicate juror bias or raise a presumption that the jury was biased.

We believe that such knowledge was so significant in this case that it does raise a presumption of bias which infringed on defendant's Sixth Amendment right to a fair trial. We are, therefore, compelled to reverse the defendant's conviction and remand the case for a new trial.

The crucial factor underlying our determination that an impartial jury was not impanelled was the inadequacy of the voir dire under the special circumstances of this case.

---

**3.** The Sixth Amendment provides in pertinent part:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed....

As previously mentioned, the publicity surrounding the Hughes case had been extensive. The trial judge revealed his sensitivity to the pretrial publicity when he stated, after a post-trial interview of an alternate juror:

Nobody expected that we were going to get a jury that did not know anything about this case. I did not. I do not think it would have been fair to expect it. As a matter of fact, if I had been handling either side of the case, I would not have wanted a jury that did not know anything about it. You would have had an idiot almost.

Defense counsel had called newspaper articles to the court's attention, which contained references to Hughes' first trial and conviction and his refusal to enter into a plea agreement. Defense counsel had expressed concern about jurors acquiring knowledge of such information.

■ The mere fact that such prejudicial news articles had been circulated just prior to trial or that prospective jurors had knowledge of information which might cause them to be prejudiced against the defendant, did not necessarily establish that an impartial jury could not be impanelled. *See Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 956, 71 L.Ed.2d 78 (1982). However, the situation did require special attention.

The Supreme Court has indicated that due process requires the trial courts to "... take strong measures to ensure that the balance is never weighed against the accused." *Sheppard v. Maxwell*, 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). Among the procedural safeguards available to protect and then maintain juror impartiality are a change of venue, juror sequestration (prior to and during deliberations), and protective instructions from the trial court. However, the most effective and perhaps most critical, under the unusual circumstances of a case such as this, is the careful use of voir dire.[4]

■ The purpose of voir dire examination is to provide the court with sufficient information to decide whether prospective jurors can render an impartial verdict based on the evidence developed at trial and in accordance with the applicable law. *Parson v. State*, Del.Supr., 275 A.2d 777, 780 (1971). Additionally, voir dire is a device which assists the State and defense counsel in the exercise of peremptory challenges. Because demeanor plays a crucial role in the determination of impartiality, the trial judge is in a unique position to evaluate jurors' assurances of impartiality. *Dutton v. State*, Del.Supr., 452 A.2d 127, 137 (1982); *Patton v. Yount*, — U.S. —, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). Consequently, the nature and extent of voir dire examination rests within the sound discretion of the trial court. *Parson v. State*, 275 A.2d at 780; *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). However, the exercise of this discretion is limited by the essential demands of fairness.

■ When appropriate, as in highly publicized cases, it may be the duty of the appellate court to independently evaluate the voir dire testimony of the impanelled jurors to insure that these due process requirements are satisfied. *Irvin v. Dowd*, 366 U.S. at 723, 81 S.Ct. at 1642.

■ An independent evaluation of the limited voir dire testimony in the Hughes case raises some serious concern as to whether defendant was allowed to take adequate steps to make sure that he was tried by a fair and disinterested panel of jurors. The few voir dire questions which were posed were addressed only to the jurors en masse, without any attempt to find out the specific knowledge which any prospective juror might have had about the

---

**4.** In commenting on the use of voir dire to identify biased veniremen, the Supreme Court noted in *Patton v. Yount*, — U.S. —, —, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984): "It is fair to assume that the method we have relied on since the beginning, *e.g., United States v. Burr*, 25 F.Cas. 49, 51 (CCD Va 1807) (Marshall, C.J.), usually identifies bias."

case. Such a procedure has been deemed to be adequate in Delaware where there has been no prior trial and the publicity has been more limited. However, under the circumstances of this case, where the court was aware of the probable prejudice on account of the pretrial publicity, such a limited form of group voir dire is deemed to have been inadequate.

The brief voir dire inquiry conducted here, directed generally at a group of 112 persons, did not allow an opportunity to observe the demeanor of any one juror. When confronted with similar situations, in which there was a corresponding likelihood that jurors had been exposed to highly prejudicial publicity, many courts have found it necessary to conduct extensive examination of jurors in an attempt to secure an impartial panel.[5]

The case of *Patton v. Yount*, —— U.S. ——, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) provides a recent example. The pertinent facts in that case are very similar to those of this case. After defendant had been convicted of murder in the first degree and rape, the Pennsylvania Supreme Court reversed the conviction and remanded the case for a new trial. At the second trial, where there was concern with juror exposure to prejudicial publicity, the voir dire questioning took ten days, there were seven jury panels and 292 veniremen, and 1,186 pages of testimony were required.

Similarly, in the Delaware case of *Parson v. State*, Del.Supr., 275 A.2d 777 (1971), the trial court questioned 197 prospective jurors, a process that consumed nine and one-half trial days.

In *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), 430 prospective jurors were assembled and 268 were ex-cused by the trial court for having fixed opinions. The transcript of the court's voir dire in *Irvin* reveals 2,783 pages of voir dire examination which covered a span of four weeks.[6]

The cases illustrate the extraordinary measures to which some courts have resorted in cases when prejudice is likely to result from pretrial publicity. While the practice in Delaware favors limited voir dire and prohibits questions which are designed to "condition" the jurors, defendant's basic right to an unbiased jury must be fully protected.

In the present case, the transcript of the voir dire proceedings involves only 17 pages of testimony and took only two hours to complete. Because of the special circumstances of this case and in view of the information later developed in the post-trial hearings, we hold that the procedures employed did not afford defendant minimal due process safeguards. More specifically, these procedures did not give defendant sufficient chance to uncover the possible bias or prejudice which was likely to exist among the jurors on account of the unusual pretrial publicity given to very prejudicial information.

■ We note the test set out in *Irvin*, which requires an evaluation of "the nature and strength of the opinion formed" by a prospective juror in deciding his ability to be an impartial juror. When there are legitimate concerns of juror exposure to unusually prejudicial pretrial publicity, this test can best be satisfied if the judge determines what information each juror has heard or read, the source of the information and how it has affected his or her attitude toward the defendant and the case

---

**5.** "Voir dire has long been recognized as an effective method of routing out such bias, especially when conducted in a careful and thoroughgoing manner." *Patton v. Yount*, —— U.S. ——, —— n. 13, 104 S.Ct. 2885, 2892 n. 13, 81 L.Ed.2d 847 (1984), *citing In re Application of National Broadcasting Co.*, 653 F.2d 609, 617 (D.C.App.1981). *See also Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976).

**6.** Compare the voir dire examinations in *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

at hand.[7] It is only after acquiring such knowledge that the judge is in a position to accurately evaluate a juror's responses and his eligibility to serve. There is no doubt that it is the "... judge who is best situated to determine competency to serve impartially." *Patton v. Yount*, 104 S.Ct. at 2893; *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). As Justice O'Connor noted in a recent concurring opinion, the juror may not be able to speak for his own bias simply because he may not be aware of its existence. *Smith v. Phillips*, 455 U.S. 209, 221–2, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring).[8] *See also Patton v. Yount*, 104 S.Ct. at 2892 (1984) and *Young v. State*, Del.Supr., 407 A.2d 517, 521 (1979).

In this case 56 of the 112 veniremen indicated possible ineligibility to serve by their unarticulated responses to the general questions posed by the court. This fact, in and of itself, tends to indicate that a more thorough process of questioning the remaining jurors was necessary.

We note the words of Justice Marshall who said, "In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it." *Murphy v. Florida*, 421 U.S. 794, 803, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975).

On the present record there was no way of judging at the time a prospective juror was drawn, whether the prospective juror was aware of prejudicial information about the case, and therefore, was likely to retain some opinion as to defendant's guilt, which he or she was hesitant to admit.[9]

■ We have indicated that the limited voir dire as conducted by the trial court amounted to error under the circumstances. However, to determine whether such error requires a reversal of defendant's conviction we must examine the extent to which defendant was likely to have been prejudiced by the inadequate voir dire. The defendant is entitled to a new trial only if the error complained of resulted in actual prejudice or so infringed upon defendant's fundamental right to a fair trial as to raise a presumption of prejudice.

■ As this Court has previously noted, the accused's right to challenge prospective jurors, either peremptorily or for

---

7. The Third Circuit has recommended the method of individual voir dire in situations involving possible juror exposure to prejudicial information. *See U.S. v. Addonizio*, 451 F.2d 49, 67 (3d Cir.1972) *cert. denied* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). The *ABA Standards Relating to Fair Trial and Free Press* §§ 3.5(e), (f) (Commentary) state the following:

Reported decisions indicate that jurors will often answer candidly when carefully questioned and when the atmosphere is not conducive to intimidation. It is important, however, that the method of separate questioning ... be followed here and that the court not adopt a practice such as that employed in *Smith v. United States*, 236 F.2d 260, 269 (8th Cir.1956) where the trial judge asked anyone who "violated the instructions of the Court" to raise his hand. The necessity of separate questioning has been emphasized in several cases, notably in *United States v. Accardo*, where the appellate court stated:

"There is no certainty that all jurors would volunteer information about violating the admonitions or admit that they were influenced by the publicity ... [I]ndividual interviews would have tended to overcome reluctance to speak out." [*United States v. Accardo*, 298 F.2d 133, 136 (7th Cir.1962).]

8. "The effect of exposure to extrajudicial reports on a juror's deliberations may be substantial even though it is not perceived by the juror himself, and a juror's good faith cannot counter this effect." *United States v. Williams*, 568 F.2d 464, 471 (5th Cir.1978).

9. In a similar situation in *United States v. Hawkins*, 658 F.2d 279, (5th Cir.1981) the court asked 58 jurors, en masse, whether they heard any information that would prevent them from being impartial. None responded. However, when questioned by counsel, 48 of 56 stated they heard or read about the case. The Circuit Court determined that the trial court's refusal to question jurors individually, in an effort to discover possible prejudice, constituted reversible error. *See also United States v. Davis*, 583 F.2d 190, (5th Cir.1978).

cause, is one of the primary safeguards available to a defendant's effort to secure an impartial jury. *Jackson v. State*, Del. Supr., 374 A.2d 1, 2 (1977). Voir dire is essential in permitting the intelligent use of peremptory challenges, and the impairment of the peremptory challenge right is reversible error without a showing of prejudice. *Swain v. Alabama*, 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965). Questions included in the voir dire in this case failed to enlighten counsel as to the type and extent of knowledge any jurors had already secured. Consequently, the respective adversaries were unable to intelligently exercise their peremptory challenges. Had the court been aware that some of the jurors knew of the defendant's prior conviction or of his having submitted to the polygraph examination, those jurors might have been excused for cause,[10] or the defense might have seen fit to exercise a peremptory challenge.

■ The post-conviction hearing reveals that jurors were aware of defendant's prior conviction for the same offense and/or his submission to a polygraph examination. Nevertheless, in his findings of fact, the trial court expressed the view that despite such knowledge, the jurors had rendered a fair and impartial verdict. We are of the opinion that such findings are not sufficiently supported by the evidence.

Juror exposure (outside the courtroom) to information that the defendant was previously convicted for the same offense, is extremely prejudicial information. As one court has stated, "... we are hard-pressed to think of anything more damning to an accused than information that a jury had previously convicted him for the crime charged." *United States v. Williams*, 568 F.2d 464, 471 (5th Cir.1978). It seems unreasonable to expect a juror to divorce

from his deliberative process, knowledge that a defendant has been previously tried and convicted, and following a reversal has been once again subjected to prosecution. The mere expenditure of so much time and expense on the part of the State might lead the average lay person to assume that such a defendant must, in fact, be guilty.[11] Indeed, even the trial judge seemed to recognize this when, in discussing defendant's motion for mistrial, which was prompted by a witness' references to the first trial, the judge stated:

> The thing that would cause a mistrial is if the jury were ever informed that there has been a prior conviction in this court. I think the fact that the jury may have been made aware of today and on one prior occasion that there have been prior proceedings in this case falls far short of that.

We now have reason to believe that some of the jury had been informed of the very fact which the trial judge recognized as a grounds for a mistrial.

■ Juror awareness that a defendant had taken a polygraph examination also involves the potential for prejudice to that defendant. The results of a lie detector test may not be submitted to establish either the guilt or innocence of an accused, unless stipulated to by both parties. *Williams v. State*, Del.Supr., 378 A.2d 117, 120 (1977). In fact, this Court noted in its decision on the first Hughes appeal that the prosecutor should have realized that "... his reference to the lie detector test would be 'reasonably likely to interfere with a fair trial'...." *Hughes v. State*, Del.Supr., 437 A.2d 559, 575 (1981). The possible prejudicial impact of such knowledge is apparent. Because polygraph examinations are "scientific" and are designed to determine the truth, such tests

---

10. The decision as to whether or not to excuse a prospective juror for cause rests in the sound discretion of the trial judge. *Parson v. State*, Del.Supr., 275 A.2d at 785.

11. "... [P]ublicity which includes information that the defendant was convicted of the same

charge at an earlier trial is a type of publicity which inherently poses a substantial risk of prejudice to a defendant if members of the jury are exposed to it." *United States v. Attell*, 655 F.2d 703, 705 (5th Cir.1981).

are likely to be given undue weight in the mind of a juror. Furthermore, the reliability of the results of such tests are questionable.

These factors prompted the Illinois Supreme Court to observe recently that the effect of such knowledge "... is subtle and unconscious, but at the same time potent" and "... exposure to this type of highly inflammatory material is enough to raise the presumption of [juror] partiality." *People v. Taylor*, 101 Ill.2d 377, 78 Ill.Dec. 359, 462 N.E.2d 478 (1984).[12]

It should also be noted that information concerning the prior trial and the polygraph examination was not acquired by the jurors in open court and, therefore, defendant could not be afforded the various due process safeguards usually available to a criminal defendant when inadmissible evidence comes to light in the courtroom.[13]

■ We recognize that prior to their selection, the jurors indicated as a group that despite any knowledge they possessed, they could be impartial and reach a fair verdict based on the evidence, and that they gave similar assurances just before they were sworn. However, when prejudicial information is acquired by jurors during trial, there is a high risk that the prejudicial information will be held against the accused. Such situations call for an even

stricter standard than those in which the information was already known on account of pretrial situations. *United States v. Williams*, 568 F.2d 464, 467 (5th Cir.1978). *See also Parker v. Gladden*, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966); *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed.2d 917 (1892) (where the Supreme Court concluded that jurors could not remain impartial in such circumstances).

Further examination reveals the reason for special concern in such situations. Jurors who had knowledge prior to trial stated during voir dire that despite such knowledge they could serve impartially. However, jurors who first learned such information during trial had merely stated that they could be fair, in light of what they *then* knew. Once they acquired new, extremely prejudicial information, their ability to remain impartial became inherently suspect, but they were not questioned further about it until after they had taken a position by rendering a verdict. Under the circumstances, the jurors' subsequent assurances at the post-conviction hearing, that they had remained impartial despite such knowledge, are of limited value.[14] For a juror to state otherwise would be tantamount to admitting that he had not fulfilled his sworn duty to be fair and impartial.[15] Indeed, in light of the limited

12. It should also be noted that the State was found to have been responsible for releasing such information to the media. *See Hughes v. State*, 437 A.2d at 575.

13. *See State v. Malone*, 333 Mo. 594, 62 S.W.2d 909 (1933) in which the court stated:
Had evidence of such matters been offered and admitted over his objections, it would have been reversible error. If the admission of such evidence in the trial, where he at least might have had opportunity to meet and perchance explain the damaging facts, would be prejudicial, it cannot be less so when the facts are brought to the attention of the jurors in the jury room by one of their fellows whose word, of course, the others have no reason to doubt and without the knowledge or consent of defendant nor with any opportunity for him to explain the facts or rebut the unfavorable inferences. *Malone*, 62 S.W.2d at 914.

14. As one court recognized in a similar situation long ago:
It is true the jurors testified that they were not affected by the statements and extraneous influences, but that kind of testimony is hardly sufficient in a case involving the liberty of a prisoner for life. Jurors will generally hold the opinion—and honestly, too—that they are not prejudiced by improper influences; but who can say that these statements, based on the personal knowledge of their associates, did not unconsciously influence their judgment and action? And who can say that they were not affected by the information wrongfully introduced in the jury room that another jury had at another time found the defendant guilty of the highest degree of the crime with which he was charged? *State v. Burton*, 65 Kan. 704, 70 P. 640, 641 (1902).

15. In taking the oath administered to a jury each juror swears that he or she had answered

nature of the proper inquiry under D.R.E. 606(b) the jurors could not be called upon to testify as to their subjective thought processes.

■ In order to obtain a new trial on the grounds that an impartial jury was never empanelled, generally speaking, "we require a showing of identifiable prejudice to the accused," *Estes v. Texas*, 381 U.S. 532, 542, 85 S.Ct. 1628, 1632, 14 L.Ed.2d 543 (1965). However, under egregious circumstances such as those presented here, the law raises a presumption of prejudice and, consequently, a violation of due process, in favor of the defendant. *See* e.g., the wave of passion in *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); improper conduct of the bailiff in *Parker v. Gladden*, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966); televising of a highly publicized criminal trial in *Estes v. State of Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); the presence of prospective jurors when the verdict was delivered at first trial in *Leonard v. United States*, 378 U.S. 544, 84 S.Ct. 1696, 12 L.Ed.2d 1028 (1964); publicity revealing that defendant was previously convicted of the same offense in *United States v. Attell*, 655 F.2d 703 (5th Cir.1981); bailiff/deputy's exposure to jurors in *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); juror exposure to inadmissible evidence in *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); and juror conduct with third parties in *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954).

One particular case which merits special attention is *United States v. Williams*, 568 F.2d 464 (5th Cir.1978). There, at least five jurors knew of, and two jurors actually saw, a news broadcast during the trial which mentioned the defendant's prior con-

viction and the subsequent grant of a new trial. There, as here, the trial judge had an opportunity to assess the extent of juror knowledge through an adequate voir dire. In *Williams*, the Fifth Circuit Court of Appeals reviewed the line of United States Supreme Court cases dealing with prejudicial publicity and followed, as we do, the rule of *Marshall v. United States*,[16] 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) that news stories during trial which reveal to jurors the defendant's prior criminal record are " 'inherently prejudicial.' " *United States v. Williams*, 568 F.2d at 469; *see also Murphy v. Florida*, 421 U.S. at 798, 95 S.Ct. at 2035. The Circuit Court extended this presumption of prejudice to cases where jurors learn about the defendant's conviction in a prior trial. It found this knowledge "even more damaging," than knowledge of the defendant's prior criminal acts, because this information "could easily be interpreted by a layman as meaning that 'the defendant got off on a technicality,' " *United States v. Williams*, 568 F.2d at 470. *See also United States v. Attell*, 655 F.2d at 705 (failure to poll jury about possible exposure to this information was reversible error). Such knowledge is so fraught with prejudice that the constitutional due process defect is not cured either by jurors' assurances that they could remain impartial or by the judge's admonition to disregard the knowledge.

■ It matters not how the jurors acquired the knowledge of the defendant's conviction in a prior trial; that they acquired the taint at all is sufficient to establish a presumption of prejudice. In addition, as we have noted, the justification for a finding of prejudice grows even stronger when jurors, as they did in the instant case, received knowledge of the defendant's prior conviction during trial. When that oc-

questions truthfully. One question posed to this venire asked if each juror could render a fair and impartial verdict.

**16.** Although the Supreme Court opinion in *Marshall* was issued pursuant to that court's supervisory powers and is therefore binding only on federal courts, we consider the opinion to be persuasive authority for the position we advocate herein.

curs, "the trial judge must squarely face the question of whether a fair trial is still possible," *United States v. Williams*, 568 F.2d at 468. Clearly, here a fair trial would not have been possible from the start because the trial court's inadequate voir dire did not enable it to ferret out tainted jurors.

Considering the nature of the harm complained of it is extremely difficult for a defendant to demonstrate that jurors were actually biased by the prejudicial information to which they were exposed. *See Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972); *Barnes v. Toppin*, Del. Supr., 482 A.2d 749 (1984).

The voir dire utilized in the instant case, due to its impersonal application, its brevity, and its limited scope is of very limited assistance in this evaluation.[17] The limitations in the inquiry permitted after the verdict under D.R.E. 606(b)[18] made it difficult for defendant to show the part which "actual bias" may have played in either group or individual juror deliberations.

Under these circumstances, requiring a defendant to show "actual bias" would be too onerous a burden to impose. The Supreme Court has observed, "... even if there is no showing of actual bias in the tribunal, this Court has held that due process is denied by circumstances that create the likelihood or the appearance of bias." *Peters v. Kiff*, 407 U.S. 493, 502, 92 S.Ct. 2163, 2168, 32 L.Ed.2d 83 (1972).[19] *See also Jackson v. State*, Del.Supr., 374 A.2d 1 (1977).

▮ In deciding whether prejudice will be presumed, the Supreme Court noted in *Marshall* that "each case must turn on its special facts." *Marshall v. United States*, 360 U.S. at 312, 79 S.Ct. at 1173. After consideration of the totality of the circumstances existing in this case, including: (1) pretrial publicity; (2) limited scope of voir dire; (3) the lack of any effective individual voir dire; and (4) evidence of juror knowledge of the prior conviction and of the lie detector test revealed at the post-conviction hearing, we conclude that such evidence creates a presumption that an impartial jury was never impanelled and

**17.** In each of the Supreme Court cases in which "actual bias" was set forth as the appropriate standard of review, the Court indicated that the voir dire examination would provide the means for a defendant to show juror partiality.

In this case the "customary" question as to the prior knowledge of the facts of the case was so modified by the judge's unusual remarks that it became a much less searching inquiry than that used in routine cases where the judge does not comment on or modify the question. Furthermore, it is customary to follow up with additional questioning when there is an affirmative answer to the question pertaining to a juror's prior knowledge. This was not done here. Thus, in a very real sense the defendant in this case did not even get the benefit of Delaware's usual abbreviated voir dire procedure.

**18.** Rule 606. *Competency of Juror as Witness.*

\* \* \* \* \* \*

(b) *Inquiry into Validity of Verdict or Indictment.* Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or con-

cerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

**19.** In the case of *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed.2d 942 (1955) the court stated, "Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness"; and *Estes v. State of Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) where a conviction was set aside despite the absence of actual prejudice and the court states:

It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process. 381 U.S. at 542–3, 85 S.Ct. at 1632–3.

that defendant's due process rights were denied.[20]

Although such a presumption is not conclusive, it stands unrebutted by anything that the State has offered or by the circumstances attending this case.[21] *See Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954).

■ In view of the record already made and in an effort to provide as fair a forum as possible, we rule that venue for any further proceedings in this case is to be transferred to New Castle County.

The defendant sets forth various other arguments in support of his contention that the Superior Court committed reversible error and denied him a fair trial. Because we have already decided to reverse the conviction and to remand the case for a new trial, we will address only those issues which survive the remand and are likely to come up again in a third trial.

## II

■ The defense argues that the trial court improperly permitted the prosecutor to display and use notes which he had personally made during his earlier interviews of witnesses. He first used the notes to refresh the recollections of two defense witnesses and then to impeach the credibility of those witnesses. As the matter came up in this case the prosecutor was, in effect, vouching for the reliability of his own notes. Under the circumstances, he should have either avoided the use of the notes or stepped down as prosecutor. *See Martin v. State,* Del.Supr., 433 A.2d 1025 (1981); *Hooks v. State,* Del.Supr., 416 A.2d 189, 207 (1980). If the same prosecutor is involved in the third trial, he must avoid the display of or the use of his personal notes as to prior statements of witnesses made to him or in his presence.

## III

■ The defense asserts that Hughes was, in effect, denied a fair trial because the trial court summarily dismissed certain pretrial motions. The issues raised in these motions had been considered before or during the first trial and the trial court's rulings on these issues had not been challenged during the first appeal. Under the circumstances, we find no merit to defendant's argument. The law is clear that rulings made by a trial court and not challenged on appeal become the law of the case. *Haveg Corp. v. Guyer,* Del.Supr., 211 A.2d 910, 912 (1965). Unless the trial court's rulings were clearly in error or there has been an important change in circumstances, the Court's prior rulings must stand. *United States v. Estrada-Lucas,* 651 F.2d 1261, 1263 (9th Cir.1980); *Smith v. United States,* D.C.App., 406 A.2d 1262 (1979). Defendant has failed to suggest a significant change in circumstances and the trial court's rulings were not clearly erroneous. Therefore, those rulings did constitute and continue to constitute the law of this case.

---

**20.** In the alternative, under a D.R.E. 606(b) analysis, the results would be the same. Defendant originally had the burden of establishing a *prima facie* case of knowledge amounting to possible prejudice as to each juror. Defendant satisfied this burden as to several jurors, thereby shifting the burden to the State. The State was then unable to rebut the inferences of bias.

**21.** *See Patton v. Yount, supra,* where a presumption of prejudice was deemed to have been rebutted by the length of time between the first and second trials and the lack of public interest.

The State does contend, however, that Hughes waived his claims of juror bias since he failed to bring information regarding such bias to the trial court's attention during the trial. While we agree that counsel had a responsibility to inform the court of alleged improprieties and thereby allow the trial court the opportunity to take corrective measures, the information which *defense counsel had during trial in this case* was so limited that the failure to reveal it cannot be deemed to constitute a waiver of the right to press the issue once additional information became available. *See United States v. Vespe,* 389 F.Supp. 1359 (D.Del.1975) *aff'd* 520 F.2d 1369 *cert. denied,* 423 U.S. 1051, 96 S.Ct. 779, 46 L.Ed.2d 640 (1976).

## IV

Defendant argues that the trial court committed reversible error by refusing to sequester the jurors throughout the course of the trial. The defendant insists that the extraordinary publicity in this case presented a very real possibility of juror exposure to prejudicial information, and under the circumstances sequestration was necessary to insure a fair trial.

 Rulings as to juror sequestration lie within the sound discretion of the trial court. *Bailey v. State*, Del.Supr., 363 A.2d 312, 319 (1976); *Hughes v. State*, Del. Supr., 437 A.2d 559, 577 (1981).[22] There is no indication in this case that the trial judge abused his discretion when he decided not to sequester the jury. The court did give daily instructions to the jurors to avoid exposure to outside influences, and each day he asked if any juror had violated those instructions. Furthermore, defendant has failed to demonstrate that he was prejudiced by the court's ruling on sequestration. *Bailey v. State*, 363 A.2d at 319; *Hughes v. State*, 437 A.2d at 578. Although we have previously concluded that the jury must have been biased, such bias does not appear to have resulted from the trial judge's failure to sequester the jurors during the entire proceeding.

 We do not mean to imply, however, that if a new trial takes place there will be no need for sequestration. If there is a third trial, it will again be the responsibility of the trial judge to decide whether sequestration would be appropriate under the circumstances of that trial. In making that determination, the court will be under a duty to consider " . . . the nature of the case, extraordinary public interest in the case, and possible prejudicial effects upon even one juror of interaction with the public, news media, family or friends." *Hughes v. State*, 437 A.2d at 577. Since the circumstances under which the third trial will take place will be different from the circumstances under which the earlier trials were conducted, the issue must be considered and determined anew.

## V

Defendant contends that various items of tangible evidence were lost or destroyed as a result of the negligent manner in which such items were handled by the police. The defendant also asserts that the failure of the police to follow routine department procedures precluded certain pieces of evidence from being scientifically tested. In particular, defendant complains of the following:

(1) Victim's address book was lost while the police had possession of it;

(2) Cigarette butts said to have been lying near the victim's body and other cigarette butts said to have been observed in and around overflowing ashtrays in the accused's home after the crime were not preserved;

(3) There was insufficient blood removed from the back step of the victim's house to permit the testing thereof;

(4) Normal police procedures were not followed, and as a result many items were field tested for blood but few were then sent to the lab for more definitive tests;

(5) The police officer who interviewed defendant soon after the murder failed to record the interview or to take contemporaneous notes of that interview.

It is the defendant's position that the State's negligent conduct in handling the foregoing matters hampered defendant's ability to defend himself.

 We are not persuaded by defendant's arguments on these issues. The State does have a general duty to gather and preserve evidence. *Deberry v. State*, Del.Supr., 457 A.2d 744 (1983). However, the rules governing the duty of the State to produce evidence also require that the de-

---

**22.** Superior Court Criminal Rule 24(e) provides: "There will be no sequestration of jurors, unless ordered by the Court."

fendant specifically designate the tangible items sought by defendant and controlled by the State. Superior Court Criminal Rule 16.[23]

An examination of defendant's discovery motion reveals no specific request for the address book or the cigarette butts. In any event, the address book has since been found and will be available. Independent evidence of the existence of the cigarette butts is contained in available photographs. Under the circumstances, the State cannot be faulted for the failure to preserve the cigarette butts for testing even though it now appears that such preservation would have been prudent.

Defendant has failed to offer any substantial support for his claim that his defense has been prejudiced by the absence of the items in question.

We do not find that the alleged deficiencies in gathering or preserving the evidence constitute reversible error.

### VI

■ Defendant contends that if his second conviction is set aside, further prosecution is barred by the double jeopardy clauses of the United States and Delaware Constitutions. There is no merit to this contention. The cases cited by defendant in support of his position are inapplicable to the case at bar.[24]

The Supreme Court long ago decided that a defendant who is re-retried after an appellate court has reversed a prior conviction for the same offense is not thereby subjected to double jeopardy. *See Ball v. United States*, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896); *Green v. United States*, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).

\* \* \*

The conviction is REVERSED and the case is REMANDED for a new trial.

---

**23.** *Super.Ct.Crim.Rule 16(b)* states in pertinent part:

> The defendant may serve upon the Attorney General a request to permit the defendant or someone acting on his behalf to inspect and copy or photograph designated books, papers, documents, tangible objects, buildings or places, copies or portions thereof which are within the possession, custody or control of the State, upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable. . . .

**24.** Both cases cited and relied on by defendant, *Arizona v. Washington*, 434 U.S. 497, 98 S.Ct.

824, 54 L.Ed.2d 717 (1978); *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), address unusual situations in which the trial court had granted motions for mistrial. In these situations the defendant has never had the opportunity to present his complete case to the jury and, perhaps, end the dispute with an acquittal. Therefore, in a few of these cases a second trial has been forbidden on double jeopardy grounds. *See United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971). The reasoning applied by the Supreme Court in those cases does not apply in cases where a defendant has exercised his right to appeal and has been granted a new trial.